**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

BROOKE WARD, individually and as Personal Representative of the Estate of KANAIYAH WARD, Deceased,
10402 Haliard St.
Cheltenham, MD 20623
Prince George's County,

*Plaintiff*,

*v.*

WES MOORE, in his individual capacity
110 State Cir.
Annapolis, MD 21401
Anne Arundel County;

RAFAEL LÓPEZ, in his individual capacity
1132 Neal St NE
Washington, DC 20002;

ALGER STUDSTILL, in his individual capacity
6779 Dorsey Rd. Apt. 347
Elkridge, MD 21075
Howard County;

ERICA TURNER, in her individual capacity
16463 Catherine Woods Ct.
Hughesville, MD 20637
Charles County;

MELISSA CHARLES, in her individual capacity
9802 Luke Ct.
Upper Marlboro, MD 20772
Prince George's County;

JOHN AND JANE DOES 1-10, in their individual capacities;

Civil Action No.: ___________________

**COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983, THE FAIR HOUSING ACT, WRONGFUL DEATH, AND RELATED CLAIMS**

**JURY TRIAL DEMANDED**

PRINCE GEORGE'S COUNTY,
MARYLAND
1301 McCormick Dr.
Largo, MD 20774
Prince George's County;

PRINCE GEORGE'S COUNTY
DEPARTMENT OF SOCIAL SERVICES
9187 Central Avenue
Capitol Heights, MD 20743
Prince George's County;

FENWICK BEHAVIORAL SERVICES, LLC
100 West Road, Suite 300
Towson, MD 21204
Baltimore County;

ERIC FENWICK
305 Hedgepocket Way
Reisterstown, MD 21136
Baltimore County;

JOHN AND JANE ROES 1–3,

MARRIOTT INTERNATIONAL, INC.
7750 Wisconsin Avenue
Bethesda, MD 20814
Montgomery County;

BALTIMORE BLUE JAY 1, LLC
251 Little Falls Drive
Wilmington, DE 19808;

EXCEL GROUP, LLC
1621 North Kent Street, Suite 1115
Arlington, VA 22209;

DIMENSION HOSPITALITY, LLC
600 Corporate Drive, Suite 640
Fort Lauderdale, FL 33334;

LSH GE GATEWAY 2, LLC
1829 Reisterstown Rd. Ste. 300
Baltimore, MD 21208
Baltimore County; and

JOHN AND JANE SMITHS 1–10;

*Defendants*.

# TABLE OF CONTENTS

**Page:**

PRELIMINARY STATEMENT ........................................ 1

PARTIES ........................................ 7

A. Plaintiff ........................................ 7

B. State and County Defendants ........................................ 8

C. Fenwick Behavioral Services, LLC ........................................ 12

D. Hotel Defendants ........................................ 12

JURISDICTION AND VENUE ........................................ 14

FACTUAL ALLEGATIONS ........................................ 15

I. MARYLAND'S FAILED FOSTER CARE SYSTEM ........................................ 15

A. Maryland's Long History of Endangering Foster Children in its Custody ........................................ 15

B. Maryland's Practice of Housing Foster Children in Hotels ........................................ 16

C. The Practice of Housing Foster Children in Unlicensed Settings Is a Nationwide Problem ........................................ 20

II. MARRIOTT—THE LARGEST HOTEL COMPANY IN THE WORLD—ALLOWS DISABLED FOSTER CHILDREN TO BE HOUSED IN ITS HOTELS ........................................ 22

A. Marriott International and its Franchising Model ........................................ 22

B. Marriott Has the Contractual Ability and Demonstrated Practice of Ending Dangerous or Unauthorized Uses of Its Franchised Properties ........................................ 24

III. THE RESIDENCE INN JHMC: A HISTORY OF INSTITUTIONAL FAILURE ........................................ 27

A. The Residence Inn JHMC Was Built on Public Land, With Public Money, and Entrusted to a Developer with a Documented Record of Public Corruption ........................................ 27

B. The Residence Inn JHMC Was Developed to House Vulnerable Guests, Including Foster Care Children ........................................ 29

C. The Residence Inn JHMC Has Been a Failed Hotel Since Its

Opening ........ 32

D. Blue Jay and Excel Purchased the Distressed Residence Inn JHMC at a Foreclosure Sale That Has Been Challenged as Rigged ........ 35

IV. KANAIYAH'S EXPERIENCE WITH THE MARYLAND FOSTER CARE SYSTEM ........ 37

A. Kanaiyah's History of Mental and Physical Health Problems ........ 37

B. PGDSS's Assumption of Custodial Responsibility of Kanaiyah ........ 38

C. For Seven Weeks, Kanaiyah Lived Alone at the Residence Inn JHMC ........ 40

D. The Individualized Placement, Safety, and Escalation Decisions Concerning Kanaiyah ........ 42

V. KANAIYAH DIES ALONE IN HER HOTEL ROOM FOLLOWING NEGLECT BY HER STATE-PROVIDED CARETAKERS ........ 46

VI. THE STATE FINALLY EMPTIES ITS HOTELS OF FOSTER CHILDREN WHILE CONCEALING CRITICAL EVIDENCE CONCERNING KANAIYAH'S DEATH ........ 48

CAUSES OF ACTION ........ 51

COUNT I: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Substantive Due Process: Duty to Protect (U.S. Const., 14th Amendment) ........ 51

COUNT II: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Substantive Due Process: State Created Danger (U.S. Const., 14th Amendment) ........ 54

COUNT III: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Unconstitutional Policy, Custom, or Procedure and Failure to Train (*Monell* and *City of Canton*) ........ 55

COUNT IV: DEPRIVATION OF MARYLAND CONSTITUTIONAL RIGHTS (Md. Decl. of Rights, art. 24) ........ 62

COUNT V: VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3604) ........ 63

COUNT VI: NEGLIGENCE AND GROSS NEGLIGENCE BY STATE AND COUNTY EMPLOYEES ........ 66

COUNT VII: NEGLIGENCE AND GROSS NEGLIGENCE BY FENWICK DEFENDANTS ........ 68

COUNT VIII: NEGLIGENCE BY DIMENSION ........ 69

COUNT IX: NEGLIGENCE BY BLUE JAY DEFENDANTS....................................... 75

COUNT X: NEGLIGENCE BY LSH (IN THE ALTERNATIVE)................................. 79

COUNT XI: NEGLIGENCE BY MARRIOTT—NEGLIGENT EXERCISE OF RETAINED CONTROL OVER SAFETY AND CHILD-PROTECTION TRAINING ........................................................................................ 81

COUNT XII: NEGLIGENCE BY MARRIOTT—NEGLIGENT UNDERTAKING ............................................................................ 88

COUNT XIII: NEGLIGENCE BY MARRIOTT—ACTUAL AGENCY ........................ 93

COUNT XIV: NEGLIGENCE BY MARRIOTT—APPARENT AGENCY ................. 100

COUNT XV: WRONGFUL DEATH (Md. Code, Cts. & Jud. Proc. §§ 3-901 et seq.) ........................................................................................... 103

COUNT XVI: SURVIVAL ACTION (Md. Code, Cts. & Jud. Proc. § 6-401) ............... 104

DEMAND FOR JURY TRIAL ........................................................................... 106

PRAYER FOR RELIEF ..................................................................................... 106

**PRELIMINARY STATEMENT**

1. For forty years, the State of Maryland has ignored the rights of the children in its foster care and abandoned the solemn responsibility it bears to protect the most vulnerable among them. Sadly, it took the death of 16-year-old Kanaiyah Ward to force the meaningful reform that Maryland's Governor, Wes Moore, and the State's General Assembly had held the authority to enact for years and repeatedly left undone.

2. Before the diagnoses and the hospitalizations that came to affect Kanaiyah's life, she was simply a child. Kanaiyah was a little girl who loved being around her friends and who found happiness in the small, ordinary things that make up a childhood. Then her life took a turn, as so many lives do, and she came to face mental-health challenges of a severity that her family, for all its love, did not have the resources to meet on its own. They did what parents in that position are meant to be able to do: they turned to the State of Maryland's foster care system for help, for support, and for guidance. In the summer of 2022, the State took Kanaiyah into its custody and, in that act, assumed a solemn and enduring duty for her safety and her well-being.

3. By the time of her death, the depth of Kanaiyah's needs was undeniable and plain to anyone who looked. At just 16 years old, Kanaiyah was already carrying diagnoses of major depressive disorder and post-traumatic stress disorder, had a documented history of suicidal ideation and prior suicide attempts, and had a body that carried more than fifty self-inflicted scars—revealing to anyone who saw her the depths of her struggles.

4. On the morning of September 22, 2025, Kanaiyah died alone in the bedroom of a financially collapsed Residence Inn by Marriott located in a crime-infested neighborhood of Middle East, Baltimore, having swallowed pills from a 365-count bottle of over-the-counter medication that the adult charged with watching her had left unsecured and within reach.

5. Every institution with a hand in Kanaiyah's care knew what she needed, and every one of them failed her. This case is about the breadth of that failure—a failure that ran from the Governor's office in Annapolis to Marriott's headquarters in Bethesda. Wherever one looks along the chain of adults and institutions responsible for keeping Kanaiyah alive, the same three facts appear together: knowledge of the dangers that caused Kanaiyah's death, the authority and ability to prevent them, and the decision to do nothing.

6. Maryland's part of that failure was decades in the making. The State has understood for more than forty years that warehousing foster children in hotels endangers their lives. A 1988 consent decree entered in Maryland federal court forbids housing any foster child "in an office, motel, hotel, or other unlicensed facility." The State's own audit of the Maryland Department of Human Services' Social Services Administration graded its child-welfare administration "unsatisfactory" in three consecutive audit cycles, a record the Legislative Auditor described as unmatched in thirty years of practice. The audit—released days before Kanaiyah died—found that 280 foster children had been placed in hotels under unlicensed, unvetted one-on-one vendors, that the State could not document any effort to find those children real placements, and that one such vendor had employed a convicted murderer the State never identified. Two years earlier, in litigation to which the Maryland Department of Human Services was a party, a 16-year-old Prince George's County foster child had overdosed—twice—on unsecured medication in a motel room. In other words, the hazard that took Kanaiyah's life had already been named, audited, litigated, and left in place.

7. The State's most senior officials saw the danger clearly and still left children exposed to it. In 2024, Secretary López—who would eventually resign in the wake of Kanaiyah's death—named hotel placements a top reform priority of Governor Moore's Administration and later told the State's Senate in January 2025 that such settings "are not appropriate for youth

experiencing out-of-home care." On September 10, 2025, twelve days before Kanaiyah died, Governor Moore personally introduced a proposal for 31 child-placement contracts and invited Secretary López to explain it. In Moore's presence, López reported that 11 children remained in hotels as of September 5 and said the administration was "determined to get to zero." At the same meeting, Comptroller Lierman described hotel and hospital overstays as "cruel" and "unnecessary." The contracts approved by Governor Moore and Secretary López funded treatment, foster care, and independent-living services; but they were *not* an order relocating every child then in a hotel. In the twelve days that followed, the Governor and the Secretary ordered no safety audit, no emergency supervision protocol, no background-check or staffing requirement, and no other measure to protect the children then in harm's way—Kanaiyah among them.

8. Proof that such action was within reach arrived one month too late. On October 22, 2025—one month after Kanaiyah died alone in a hotel—Governor Moore's Administration issued a single directive that emptied Maryland's hotels of foster children within weeks. In other words, the instrument that could have saved Kanaiyah existed before she died and was simply never used.

9. When the State placed Kanaiyah in the failing hotel, it did so with the expectation and understanding that she would receive one-on-one, around-the-clock supervision from trained caretakers from Fenwick Behavioral Services, LLC ("Fenwick"). These caretakers, the State was told, would conduct in-person checks of Kanaiyah every hour and would ensure that all medication be secured and out of reach of Kanaiyah—precisely because Fenwick knew Kanaiyah's history of suicidal behavior. Fenwick, however, failed to satisfy these basic requirements.

10. When Kanaiyah's caretaker's coworker called out sick, Fenwick's management stretched the on-duty caretaker's shift to roughly 53 consecutive hours rather than secure alternative coverage or walk Kanaiyah to the hospital directly across the street. The overworked caretaker neglected her duty to perform hourly wellness checks on Kanaiyah. She also failed to

follow the medication-lockbox policy, leaving a 365-count bottle of over-the-counter medication within Kanaiyah's reach. Beyond that, this overworked caretaker, who was entrusted with a high-risk child's life and well-being, did not know how and was unwilling to perform CPR. She also did not know where to locate potentially life-saving medical equipment, like a defibrillator.

11. The Residence Inn, where Kanaiyah had been living continuously for the seven weeks before her death, was simply not a suitable housing option for her (or any other foster care child). The hotel sat on public land conveyed to its developer for ten dollars and built out with public money, under the control of a developer, Ronald Lipscomb, whose guilty plea in a City Hall corruption scandal, subsequent bankruptcy, and unpaid tax liens were all matters of public record. Its $86.6 million price tag ran nearly three times the industry norm per room. Worse, the individuals who invested in the hotel (and who later sued Lipscomb-controlled entities for fraud) claim that millions of dollars from their original $47 million investment were siphoned through fictitious fees long before the first guest ever arrived. Marriott franchised its Residence Inn brand to this ownership group nonetheless, either missing what a routine background check discloses or seeing it and proceeding anyway. From there, the property only declined further.

12. By the time Kanaiyah was placed there, the hotel was collapsing in plain view. By mid-2025, the property operated with no approved budget, an operating account bleeding cash, and mounting unpaid bills. In November 2024, Kierra Tripp was shot and killed inside the hotel during an unsanctioned party. No owner, manager, or franchisor answered that killing with any meaningful corrective measure—no probation, no emergency inspection, no enhanced security. Indeed, it was just another among the more than 4,000 publicly reported crimes committed within a two-block radius of the hotel in the two years prior to Kanaiyah's death. Yet the Marriott flag kept flying and the franchise fees kept flowing—more than $400,000 by mid-2025—even as Marriott audited the books, inspected the premises, and thus knew exactly what its name was hanging over.

13. The vulnerable population was the hotel's entire business plan. The property had been conceived, financed, and marketed as a medical-adjacent facility drawing patients, families, and disabled children from the Johns Hopkins Medical Campus and the Kennedy Krieger Institute. It was specifically and intentionally outfitted with more ADA-compliant rooms than federal law required, a dedicated Children's House Lounge for child guests, and, upon information and belief, a standing arrangement with Fenwick to house foster children for extended stays in place of licensed care. Marriott, for its part, built its broader Residence Inn extended-stay brand around the same population, co-locating properties beside major hospitals across the country and advertising them as bridges from acute care to home recovery—all while publicly proclaiming child protection a core corporate value and training hundreds of thousands of employees to recognize the exploitation and neglect of vulnerable guests. The defendants understood precisely who would be sleeping in these rooms. They marketed to that population, and they profited from it.

14. In June 2025—weeks before Kanaiyah's placement—the distressed hotel sold at a foreclosure auction that its investors have challenged as rigged. The buyers, Baltimore Blue Jay 1 and Excel, purchased the property for roughly $10 million (even though it appraised at $32.7 million and was built for $86.6 million). When Baltimore Blue Jay 1 and Excel took title, they knew or should have known the hotel housed vulnerable, state-placed children; yet, in the weeks before Kanaiyah's death, they evidently undertook no safety assessment, remediated no hazard, replaced no manager, and added no additional security. Marriott, upon information and belief, demanded no property-improvement plan and conducted no reinspection.

15. It was into this building that the State of Maryland—in August 2025—placed Kanaiyah, a child whose risk could not have been more apparent. Kanaiyah had spent more than 3 years in foster care carrying diagnoses of major depressive disorder and post-traumatic stress disorder, recurrent suicidal ideation, and prior suicide attempts. A clinical assessment had formally

concluded months earlier that her level of care was insufficient, and five residential facilities had refused her as beyond what they could safely manage. Prince George's County's own referral to Fenwick directed that the one-on-one supervision was meant to "lessen the risk of suicide attempts." Her mother, Brooke Ward, warned caseworkers again and again that her daughter was high-risk and tried to get her out of the hotel, and into a proper treatment facility. On August 20, 2025, Kanaiyah's social worker answered that the State was "still at a roadblock regarding placement." The best the State could offer was a follow-up clinical assessment scheduled for late September—an appointment Kanaiyah did not live to see.

16. On the morning of September 22, after a 5:45 a.m. check to which Kanaiyah responded but did not rise, the lone Fenwick caretaker—by then on duty for nearly 44 hours—left her unattended for more than four hours, over four times the maximum interval Fenwick's policies allowed. When the caretaker returned after 10:00 a.m., Kanaiyah was cold and not breathing. Asked by the 911 dispatcher whether she could perform CPR, the caretaker answered, "I don't know how" and rebuffed the dispatcher's multiple offers to instruct her on how to perform it. The caretaker likewise could not locate the defibrillator. Instead, she stood idly by as pills lay scattered across the bed and the floor, next to Kanaiyah's suicide note. Emergency personnel pronounced her dead at 11:01 a.m. on September 22, 2025.

17. The reckoning that followed confirmed that the numerous failures that contributed to Kanaiyah's death were systemic, known, and avoidable. The State severed its relationship with Fenwick within two days, emptied its hotels of children within weeks, and issued an investigative report that found neglect. More recently, the Maryland General Assembly enacted "Kanaiyah's Law," barring the placement of foster children in unlicensed hotel settings. Each reform is an admission that the protections capable of keeping Kanaiyah alive were known, available, and withheld. Yet the hotel still flies the Marriott name above its door, still remits massive franchise

fees to Marriott, still markets itself to the medical population it was built to serve, and still operates its Children's House Lounge. Meanwhile, Marriott still allows disabled foster care children to be housed in its nearly 6,000 hotels across the remaining states where the warehousing of foster children has not yet been made illegal. At each of these properties, Marriott's brand promise that landed Kanaiyah at the Residence Inn in Baltimore remains intact—unreformed, unretracted, and unaccompanied by any of the safety commitments that brand promise was intentionally designed to convey.

18. Kanaiyah Ward depended completely on the adults and institutions the law placed between her and a harm she could not resist on her own. The State that took custody of her, the officials who ran its foster-care system, the County that managed her case, the contractor that promised to watch her, and the owners, manager, and franchisor that housed her for profit each possessed both the knowledge of her peril and the power to end it. Each chose revenue, convenience, or inaction instead.

19. Plaintiff Brooke Ward—Kanaiyah's mother, suing individually and as Personal Representative of her daughter's Estate—brings this action to hold every one of them accountable for what they did, for what they failed to do, and for the death of a child who had no one else to protect her. She further brings this action to ensure that Marriott hotels are places of hospitality, not unlicensed foster-care placements, and so that no other family loses a child in a Marriott-branded hotel room because Marriott permitted its franchisees to treat a vulnerable child as an ordinary hotel guest.

## PARTIES

### A. Plaintiff

20. Plaintiff Brooke Ward is an adult citizen of the State of Maryland residing in Prince

George's County and the mother of Kanaiyah Ward. She brings this action individually as a surviving parent under the Maryland Wrongful Death Act, Md. Code, Cts. & Jud. Proc. § 3-904, and as the duly appointed Personal Representative of the Estate of Kanaiyah Ward pursuant to Letters of Administration issued by the Orphans' Court for Prince George's County, Maryland.

### B. State and County Defendants

21. Defendant Wes Moore is the Governor of the State of Maryland. As Governor, Moore is the chief executive officer of the State of Maryland with direct constitutional and statutory authority to supervise and direct the Secretary of the Maryland Department of Human Services, who serves at the Governor's pleasure. Moore is sued in his individual capacity for his deliberate indifference to the known risk of serious harm to children housed in unlicensed hotel settings under the supervision of unvetted contractors—a risk of which he had actual knowledge no later than September 10, 2025 (12 days before Kanaiyah's death) when members of his own Administration informed him that children were being housed in dangerous, inadequate hotel placements that were "cruel" and "unnecessary." Despite that knowledge, Moore took no immediate executive action to protect children currently in hotel placements—including Kanaiyah—despite having just heard the warnings from senior members of his Administration that Kanaiyah's placement was "cruel" and "unnecessary."

22. Defendant Rafael López was the Secretary of the Maryland Department of Human Services ("DHS") at all times relevant to this action. He is sued in his individual capacity only. As Secretary, López was the senior state official responsible for administration of Maryland's foster care system, including oversight of the hotel placement program, contracting and supervision of unlicensed vendors, and implementation of corrective measures identified in successive audit reports. López possessed authority to direct Maryland's Social Services Administration ("SSA") and local departments to impose emergency conditions on unlicensed placements; require verified

supervision, relief coverage, medication-security measures, and emergency-response capacity; require escalation and reporting when a provider could not safely staff a placement; suspend or terminate referrals to unsafe vendors; and direct the immediate review or relocation of high-risk children residing in hotels. Upon information and belief, López received or had access to information identifying the continued use of hotels for children with serious behavioral-health needs, including children under the supervision of unlicensed one-on-one vendors, and had access to the reporting and review mechanisms described in Paragraphs 165–169.

23. Defendant Alger Studstill was the Executive Director of the Maryland Social Services Administration at all times relevant to this action. He is sued in his individual capacity only. As Executive Director, he bore direct responsibility for supervising the local departments of social services, implementing audit recommendations, and maintaining oversight systems governing foster care placements statewide. Studstill also possessed authority and responsibility to ensure that local departments complied with SSA's hotel-stay reporting, placement-review, vendor-oversight, and quality-assurance requirements; to require corrective action by a local department; to escalate failures to the Secretary; and to intervene when a local department maintained a high-risk child in an unsafe unlicensed setting. Upon information and belief, Studstill received or had access to statewide and local data, reports, and escalation materials showing that children, including high-risk children, remained in hotels without adequate licensed placements and under the supervision of unlicensed one-on-one vendors.

24. Defendant Studstill has, in his own words, publicly admitted the very facts of knowledge and delayed response alleged throughout this Complaint. In an op-ed published in The Imprint on October 5, 2026, titled "How Maryland Ended its Use of Unlicensed Placements for Foster Youth," Studstill wrote that Maryland child welfare leaders had "just as much to learn from the voices of young people" harmed by hotel and office placements as the public did, and that

"these placements are not merely administrative failures; they are deeply dehumanizing disruptions for young people who have already survived profound trauma." Studstill further admitted that Maryland "recognized that ending hotel and other unlicensed placements required a thoughtful structural overhaul" and that the State achieved this only "after years of work, intentional planning and continued investment," ending the decades-long practice in October 2025—after Kanaiyah's death. Studstill's own account establishes that Maryland's senior child-welfare leadership, including Studstill himself, knew of the specific dangers of hotel placements, knew the specific remedial tools required to address them—including restructured provider rate investments, "Rapid Response Review Teams" capable of authorizing "individualized wraparound services, emergency funding or specialized staffing within hours," and cross-agency monitoring to prevent hospital overstays—and chose to develop and deploy those tools gradually over a period of years rather than on an emergency basis for children, including Kanaiyah, who were housed in hotels in the interim.

25. Defendant Erica Turner was, as of September 22, 2025, the individual who, in law or in fact, whether or not officially designated as such, was acting as the Director of Prince George's County Department of Social Services ("PGDSS"). She is sued in her individual capacity for her personal role in the placement, contractor selection, and oversight decisions that contributed to Kanaiyah's death. Turner had authority, directly or through subordinate supervisors and placement personnel, to review and approve or halt high-risk hotel placements; require enhanced safety planning; direct monitoring of one-on-one vendors; require escalation when continuous supervision was jeopardized; and seek assistance from SSA or DHS when PGDSS could not secure an appropriate licensed placement. Upon information and belief, Turner received or had access to information identifying Kanaiyah's continued placement at the Residence Inn JHMC, her documented suicide risk, the lack of a secured alternative placement, and the fact that Fenwick's

performance was the sole protection against foreseeable self-harm during her extended hotel living.

26. Defendant Melissa Charles was, at all times relevant to this action, a social worker employed by PGDSS. As Kanaiyah's assigned social worker, she was personally responsible for decisions concerning her hotel placement, the selection and monitoring of Fenwick, and the supervision of a known high-risk youth in an unlicensed hotel setting. She is sued in her individual capacity. Charles participated in, recommended, approved, implemented, and/or continued Kanaiyah's placement at the Residence Inn JHMC; prepared, received, or acted upon the referral to Fenwick; and had access to Kanaiyah's case record, risk history, service-provider information, and communications from Kanaiyah's mother. Upon information and belief, Charles had authority to seek supervisory review, require a written safety plan, confirm Fenwick's ability to provide uninterrupted coverage, verify medication-lockbox compliance and emergency-response capability, request an alternative emergency or clinical placement, and escalate the matter to PGDSS leadership, SSA, or DHS. She failed to take reasonable available measures to protect Kanaiyah from the foreseeable risks of an indefinite, unlicensed hotel placement.

27. Defendants John and Jane Does 1–10 are the individual caseworkers, supervisors, and officials of DHS, SSA, PGDSS, and/or the Prince George's County Social Services Board who were personally responsible for decisions concerning Kanaiyah's indefinite hotel placement, the selection and monitoring of Fenwick, and the supervision of a known high-risk youth in an unlicensed hotel setting. Their identities will be added by amendment when ascertained through investigation and discovery. They are sued in their individual capacities.

28. Defendant Prince George's County, Maryland is a political subdivision of the State of Maryland. As a local governmental entity, Prince George's County is a "person" subject to suit under 42 U.S.C. § 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). The County is also subject to the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc. §§ 5-301 et seq.

29. Defendant PGDSS, with its principal office at 9187 Central Avenue, Capitol Heights, Maryland 20743, is the local department of social services for Prince George's County. PGDSS bore direct case management responsibility for Kanaiyah prior to and at the time of her death, including responsibility for her hotel placement, selection and contracting with Fenwick, and monitoring of her care.

**C. <u>Fenwick Behavioral Services, LLC</u>**

30. Defendant Fenwick Behavioral Services, LLC is a Maryland limited liability company with its principal place of business at 100 West Road, Suite 300, Towson, Maryland 21204. Fenwick was a state contractor retained to provide one-on-one, continuous supervision and behavioral support to Kanaiyah during her hotel placement. Upon information and belief, Fenwick also maintained a formal, recurring arrangement with the Residence Inn by Marriott Baltimore at the Johns Hopkins Medical Campus ("Residence Inn JHMC") to supervise foster children placed in its care.

31. Defendant Eric Fenwick, a resident of Maryland, is, upon information and belief, co-owner of Fenwick. He is sued in his individual capacity for his personal direction and/or authorization of the staffing and operational decisions that contributed to Kanaiyah's death.

32. Defendants John and Jane Roes 1–3 are the three individual Fenwick staff members identified in the DHS investigation as responsible for the indicated child neglect determination. Their full identities are not yet known to Plaintiff and will be added by amendment.

**D. <u>Hotel Defendants</u>**

33. The "Hotel Defendants" are Defendants Marriott International, Inc., Dimension Hospitality, LLC ("Dimension"), Baltimore Blue Jay 1, LLC, Excel Group, LLC, LSH GE Gateway 2, LLC, and John and Jane Smiths 1–10.

34. Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with

its principal place of business at 7750 Wisconsin Avenue, Bethesda, Maryland 20814. At all times relevant hereto, Marriott was the franchisor of the Residence Inn JHMC.

35. Dimension Hospitality, LLC, is a Florida limited liability company with its principal place of business at 600 Corporate Drive, Suite 640, Fort Lauderdale, Florida 33334. Prior to and at the time of Kanaiyah's death, Dimension served as the third-party hotel management company of the Residence Inn JHMC.

36. Defendant Baltimore Blue Jay 1, LLC ("Blue Jay") is a limited liability company organized under the laws of Delaware, with its registered office at 251 Little Falls Drive, Wilmington, Delaware 19808. Following the June 25, 2025 foreclosure auction of the Residence Inn JHMC, Blue Jay holds an ownership interest in the real property and businesses located at 800 North Wolfe Street, Baltimore, Maryland 21205.

37. Defendant Excel Group, LLC ("Excel") is a Virginia-based limited liability company with its principal place of business at 1621 North Kent Street, Suite 1115, Arlington, Virginia 22209. Upon information and belief, Excel holds an ownership or operational interest in the real property and businesses located at 800 North Wolfe Street, is affiliated with Blue Jay through a common principal, and participated jointly in Blue Jay's acquisition and operation of the hotel following the June 2025 foreclosure sale.

38. Defendant LSH GE Gateway 2, LLC ("LSH") is named herein as a defendant in the alternative. In the event that the June 25, 2025 foreclosure sale of the Residence Inn JHMC is set aside, voided, or otherwise invalidated by a court of competent jurisdiction, and LSH is thereby restored as the rightful owner of the real property located at 800 North Wolfe Street, Baltimore, Maryland 21205, LSH would bear liability for the claims asserted herein against the other Hotel Defendants to the same extent as if the foreclosure sale had not occurred. Plaintiff asserts claims against LSH in the alternative, and reserves the right to pursue all such claims against LSH should

the foreclosure sale be set aside.

39. Defendants John and Jane Smiths 1–10 are additional individuals or entities whose true identities are not yet known to Plaintiff but who are believed to have participated in, contributed to, or otherwise bear responsibility for the events giving rise to this Complaint as to the claims against the other Hotel Defendants. Plaintiff will seek leave to amend upon identifying them through discovery.

**JURISDICTION AND VENUE**

40. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including 42 U.S.C. § 1983 and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.

41. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) over the § 1983 civil rights claims.

42. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

43. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District of Maryland, and the hotel that is the subject of this action is located at 800 North Wolfe Street, Baltimore, Maryland 21205. Defendant Marriott International is headquartered in Bethesda, Maryland, within this District.

44. Venue is proper in the Southern Division of this District pursuant to Local Rule 501.4(a) because both the Maryland local government and agency defendants and Plaintiff are located in the Division. Venue is additionally proper in the Southern Division of this District pursuant to Local Rule 501.4(b) because a majority of the Maryland parties reside in this Division.

## FACTUAL ALLEGATIONS

### I. MARYLAND'S FAILED FOSTER CARE SYSTEM

#### A. Maryland's Long History of Endangering Foster Children in its Custody

45. Maryland has known for more than 40 years that its foster care system endangers the children it is obligated to protect. In 1984, a federal class action—*L.J. v. Massinga*—was filed on behalf of foster children in Baltimore City, alleging systemic failures in the provision of foster care services. The resulting consent decree, most recently modified in 2009, explicitly provides that "no child may be housed in an office, motel, hotel, or other unlicensed facility."[1] That prohibition in Baltimore City has been in force for four decades. Court monitors and the Office of Legislative Audits ("OLA") have, however, repeatedly documented its violation.

46. SSA received an "unsatisfactory" rating on accountability and compliance from OLA for 3 consecutive audit cycles—in reports issued in November 2017, June 2021, and September 2025—with certain findings persisting since 2008. Legislative Auditor Brian Tanen stated: "In my 30 years, we have never had an agency go three audits in a row with an unsatisfactory."[2]

47. OLA attributed these persistent failures to SSA's lack of a comprehensive quality assurance program to ensure local departments properly administered child welfare programs, which resulted in "numerous issues affecting children's safety and well-being." SSA also failed to refer chronically noncompliant local departments to the DHS Secretary as required by its own internal policy; SSA management advised that the referral policy "was not being enforced since

---

[1] *LJ v. Massinga*, No. 1-84-cv-4409-ELH, (D. Md. Apr. 7, 2021), ECF No. 652-17, available at https://dhs.maryland.gov/documents/Local%20Offices/Baltimore%20City/Consent%20Decree/64th%20Compliance%20Report/64th%20Report/Att.%20F4,%2068.pdf.

[2] Jean Marbella, *A scathing audit, a girl's suicide: Maryland foster care officials in the hot seat*, Balt. Sun (Oct. 29, 2025), https://www.baltimoresun.com/2025/10/29/foster-care-suicide-hotels-hearing/.

early 2023." The 2025 audit confirmed that SSA had not resolved 6 of 8 findings from the preceding 2021 audit, which had itself identified repeat findings from the 2017 audit.[3]

48. In response to each audit, DHS committed to implementing corrective measures by specific deadlines. Those commitments, however, were not kept.

**B. Maryland's Practice of Housing Foster Children in Hotels**

49. The September 2025 OLA audit—released ten days before Kanaiyah's death—confirmed the scope and severity of Maryland's practice of placing foster children in hotels. OLA found that 280 foster children had been placed in hotels under the supervision of unlicensed one-on-one vendors during fiscal years 2023 and 2024, including 82 children who remained in hotels for between three months and two years. SSA could not document its efforts to identify appropriate placements for any of these children.[4]

50. Moreover, SSA lacked procedures to ensure criminal background checks were obtained for vendor employees providing one-on-one services to children in hotels, and OLA disclosed that at least one such vendor employed an individual convicted of murder—a disqualifying offense SSA had failed to identify. Because these vendors were not licensed providers, they were not subject to oversight by local departments of social services or the DHS Office of Licensing and Monitoring, leaving, in OLA's words, "a lack of assurance that children in their care received satisfactory services."[5]

51. The State's knowledge that hotel placements posed a lethal risk to foster children

[3] *See* Office of Legislative Audits, Audit Report, Department of Human Services, Social Services Administration (Sept. 12, 2025), available at https://dls.maryland.gov/pubs/prod/NoPblTabPDF/SSA25.pdf.

[4] *See* OLA, September 2025 SSA Audit, available at https://dls.maryland.gov/pubs/prod/NoPblTabPDF/SSA25.pdf.

[5] *See* OLA, September 2025 SSA Audit, "One-on-One Services Vendors" and Finding 6, available at https://dls.maryland.gov/pubs/prod/NoPblTabPDF/SSA25.pdf.

extended beyond its own audit findings. Roughly two years before Kanaiyah's death, a virtually identical incident was documented in federal litigation to which various DHS and SSA officials were parties. Specifically, in *Y.A. v. Padilla*, Case No. 1:23-cv-109 (D. Md.), filed January 17, 2023, a 16-year-old foster child from Prince George's County twice overdosed on his medications while placed in a motel room—left without supervision and with unlocked medications accessible to him. DHS and its officials, including those named herein, had actual knowledge of those overdose incidents well before Kanaiyah was placed at the Residence Inn JHMC.

52. Maryland's own officials have repeatedly acknowledged that hotel placements were dangerous and contrary to sound policy.

53. In February 2024, Defendant López identified hotel stays as one of the Moore Administration's eight major reform priorities.

54. On January 14, 2025, Defendant López testified before the Maryland Senate Judicial Proceedings Committee that unlicensed settings such as hotels "are not in the best interest of youth . . . [and] are not appropriate for youth experiencing out-of-home care."

55. On September 10, 2025, Governor Moore personally introduced Department of General Services Item 26-S and invited Secretary López to address it. Moore described the request as a "$279 million contract with 31 vendors" for treatment, foster-care, and independent-living programs. Addressing Moore and the Comptroller, López reported: "On September 5th of this year, we had 10 youth in hospitals and 11 in hotels," and stated that the administration was "determined to get to zero." Comptroller Lierman added, in the same discussion, "It's cruel. It's unnecessary to subject youth in foster care to overstays in hotels and hospitals." These statements were made to Moore at the meeting he attended.[6] That same day, the Maryland Board of Public Works (of which

[6] *See* Board of Public Works, Sept. 10, 2025, Tr. at 14–18, available at https://bpw.maryland.gov/MeetingDocs/2025-Sep-10-Transcript.pdf.

the Governor was a voting member) approved a $465 million contract to expand foster care placement capacity—an official acknowledgment that the placement shortage was a known crisis requiring remediation at nearly half a billion dollars' cost.

56. The September 2025 audit and DHS's response described both longstanding deficiencies and corrective measures DHS said it had begun. The response identified SSA-CW Policy #25-01, hotel-stay reporting, a Rapid Response Meeting within 48 hours, and weekly SSA Placement and local-department meetings. The September 10 procurement agenda separately described a policy effective March 1, 2025 requiring notice to SSA and the Secretary's Office within 24 hours after a youth entered an unlicensed setting, together with weekly local-department visits.[7] The State and County Defendants ignored, disregarded, and otherwise failed to comply with these policies and directives.

57. Governor Moore, for his part, appointed Defendant López as Secretary of DHS. In that capacity, Secretary López served at the Governor's pleasure and was subject to his direction and supervision as a constitutional matter. As chief executive, Governor Moore possessed the authority to direct DHS operations, issue executive directives governing the foster care system, and order emergency protective measures for children in state custody. His administration demonstrated that authority concretely on October 22, 2025 when (four weeks after Kanaiyah's death) Secretary López issued a directive ordering all local departments of social services to immediately cease placing children in unlicensed hotel settings. The executive mechanism that ended the hotel placement program after September 22 was available to the Governor but was simply not invoked.

---

[7] *See* OLA, September 2025 SSA Audit, Finding 6, available at https://dls.maryland.gov/pubs/prod/NoPblTabPDF/SSA25.pdf; *see also* Sept. 10, 2025 Agenda, Item 26-S, p. 107, available at https://bpw.maryland.gov/MeetingDocs/2025-Sep-10-Agenda.pdf.

58. Governor Moore's knowledge of the dangers attendant to the placement of foster children in hotels is established as a matter of public record when, among other things, senior members of his Administration told him that the State needed to "get to zero" children in hotels and that the placement of children in these hotels was "cruel" and "unnecessary." In other words, as of September 10, 2025—12 days before Kanaiyah died—Governor Moore sat as a member of the Board of Public Works and voted to approve the $465 million contract referenced above. That vote establishes that Governor Moore knew, as of September 10, 2025: (a) that Maryland's foster care placement capacity was critically inadequate; (b) that children were being housed in unlicensed hotel settings as a direct consequence of that shortage; and (c) that the situation required urgent intervention.

59. Between September 10, 2025, when Governor Moore was told of the cruelty of hotel placements, and September 22, 2025, when Kanaiyah died, Governor Moore, upon information and belief, took no emergency executive action to protect the children then in hotel placements, Kanaiyah among them. He did not order an immediate safety audit of hotel placements. He did not direct DHS to implement emergency supervision protocols for children with documented suicide risk housed in hotels. He did not issue any directive requiring background checks, CPR certification, medication security protocols, or minimum staffing standards for the unlicensed contractors then supervising children in hotel rooms.

60. Following Kanaiyah's death, on October 22, 2025, Governor Moore directed Secretary López to issue a directive ordering all local departments of social services to immediately cease facilitating stays in unlicensed settings and to relocate all children then in hotels to appropriate placements by November 24, 2025. By mid-November 2025, the number of Maryland foster children in hotels finally reached zero.

61. The October directive and subsequent reduction of hotel placements show that the

State later adopted a more categorical response. That response, however, came too late and was not able to protect Kanaiyah before her passing on September 22.

62. Defendant Studstill's own public account of these events confirms that the State's delay was a conscious institutional choice rather than an unavoidable administrative reality. Studstill recently wrote that Maryland "recognized" the need for hotel-placement reform and understood that addressing it required tackling "root causes" including "inadequate provider rates, fractured mental health safety nets and bureaucratic delays in emergency response"—the very deficiencies alleged throughout this Complaint—but that the State nonetheless treated an immediate ban on hotel placements as undesirable absent the years of planning it ultimately took. Studstill has specifically identified the tools that Maryland eventually used to end the practice, including a restructured provider rate package, "Rapid Response Review Teams" bringing "clinical experts, agency leadership and behavioral health providers together immediately upon a placement crisis" to authorize emergency funding or specialized staffing "within hours," and daily cross-agency monitoring to move youth out of hospital overstays. None of these tools, by Studstill's own account, were deployed in time to protect Kanaiyah, even though the State possessed the institutional knowledge and capacity to develop and implement them well before her death on September 22, 2025.

### C. <u>The Practice of Housing Foster Children in Unlicensed Settings Is a Nationwide Problem</u>

63. Maryland's failure to protect Kanaiyah was not an aberration confined to one state's foster care system. The use of hotels, motels, and other unlicensed settings to house children in foster care is a documented, nationwide practice—one that federal oversight authorities have studied, quantified, and found to pose serious risks to children's safety and well-being.

64. In July 2026, the Office of Inspector General of the U.S. Department of Health and

Human Services ("OIG") issued a nationwide audit report titled National Overview of State-Level Challenges and Efforts To Minimize or Eliminate Temporary Emergency Placements in Foster Care, Report No. A-07-24-06114 (the "OIG Report").[8] The OIG Report was based on a questionnaire completed by state agency program administrators in all 50 states and the District of Columbia, covering the period January 1, 2022 through June 30, 2023.

65. The OIG Report found that 42 state agencies reported using temporary emergency placements—settings such as hotels, motels, and government offices that are not licensed and not designed to care for children—to house children in foster care when no other appropriate placement was available. Of the 34 state agencies that tracked their use of these placements, they reported, in the aggregate, a total of 15,705 stays in such settings during the audit period, with the longest single stay lasting 251 days in a hotel.

66. With respect to hotels specifically, 17 state agencies reported a combined 1,922 hotel room stays for children in foster care during the audit period. The OIG Report noted that state agencies typically rented hotel rooms to house children and attempted to provide oversight through measures such as placing staff in adjacent rooms or hiring security personnel.

67. The OIG Report catalogued the dangers inherent in these placements in terms that describe precisely what happened to Kanaiyah. Twenty-four state agencies reported incidents of children harming themselves or others while in temporary emergency placements, including suicidal ideation. The OIG Report specifically cited a 2024 media report of a child in Oregon's foster care custody who died by suicide while living in a hotel room—a tragedy that prefigured Kanaiyah's death by more than a year. Separately, 25 state agencies reported challenges with

[8] National Overview of State-Level Challenges and Efforts To Minimize or Eliminate Temporary Emergency Placements in Foster Care, OIG, HHS, Report No. A-07-24-06114 (July 2026), available at https://oig.hhs.gov/documents/audit/11816/A-07-24-06114.pdf.

inadequate supervision, including staff who lacked the necessary training to meet children's medical and behavioral health needs.

68. Maryland itself was among the states included in the OIG Report and which, through DHS, provided detailed information to investigators in response to various information requests. DHS was, therefore, aware that federal investigators have long considered the practice of housing foster children in hotels to be unsafe and improper. In response to various requests, Maryland reported 121 children and 164 total stays in temporary emergency placements during the audit period, though Maryland's data did not permit OIG to determine how many of those stays occurred in hotels as opposed to state or county offices. Maryland separately told OIG that "maintaining therapeutic services can also be a challenge, if the hotel is not near the provider, or if telehealth is not possible."

69. The OIG Report's findings confirm what the facts of this case make plain: the warehousing of vulnerable foster children in hotels is not a problem unique to Maryland or to the Residence Inn JHMC. It is a systemic practice, documented at the federal level across dozens of states, carrying known and foreseeable risks of exactly the kind that killed Kanaiyah. As set forth below, Marriott—whose Residence Inn brand supplied the room in which Kanaiyah died—permits this same practice to continue unabated at its franchised properties nationwide.

## II. MARRIOTT—THE LARGEST HOTEL COMPANY IN THE WORLD—ALLOWS DISABLED FOSTER CHILDREN TO BE HOUSED IN ITS HOTELS

### A. Marriott International and its Franchising Model

70. Marriott is the largest and, according to Fortune magazine, the most admired hotel company in the world. In 2025, Marriott generated over $26 billion in revenue from its expansive portfolio of more than 9,800 hotels across 145 countries and territories.

71. Marriott's various hotel brands are organized into three broad tiers: luxury,

premium, and extended-stay. Marriott's luxury tier includes brands such as The Ritz-Carlton and St. Regis; its premium tier includes Sheraton, Westin, and Renaissance; and its extended-stay tier—the segment relevant to this case—includes the Residence Inn by Marriott, among others.

72. The Residence Inn is Marriott's flagship extended-stay option. First launched in 1975 and acquired by Marriott in 1987, there are now more than 900 Residence Inns in 15 different countries, making it one of the most widely distributed extended-stay hotel brands in the world.

73. The Residence Inn's extended-stay hotel model differs structurally from transient hotel occupancy. The properties are designed and marketed to guests whose stays extend beyond a few nights, including patients and families near medical facilities and others who need a residential-quality environment for weeks or even months at a time. Accordingly, each room features residential-style living, including full kitchens or kitchenettes, separate living and sleeping areas, and amenities designed specifically for long-term living.

74. The Residence Inn properties operate either as Marriott-owned and managed properties or as franchisees. Under Marriott's franchising model, Marriott licenses the "Residence Inn by Marriott" name and its operational systems to third-party owners and management companies.

75. To the consuming public, there are no perceivable differences between a Marriott-owned and a franchised Residence Inn. The brand name itself communicates that each property is "by Marriott." Among other things, there is no difference between franchised and owned-and-operated Residence Inn properties with regard to: (i) the public's ability to book stays through the Marriott.com platform, which does not distinguish between properties; (ii) the public's ability to earn and redeem Marriott loyalty points; (iii) the signature design, signage, amenities, and service standards guests experience when visiting the property; and (iv) the pervasive use of the Marriott name, logo, and branding. A reasonable guest or booking party reserving a stay at a Residence Inn

therefore has no way of knowing, and no reason to inquire, whether that particular property is Marriott-run or franchised.

76. This uniformity is intentional. Marriott's branding and marketing for Residence Inn is specifically designed to project a unified, seamless experience irrespective of ownership or management structure. That uniformity is precisely what makes the Residence Inn name valuable to franchisees, who rely on it and on Marriott's goodwill to attract guests.

77. The Residence Inn JHMC has, at all relevant times, operated as a franchised Marriott property and is among various Marriott-branded properties that have been used to house vulnerable individuals in the custody and care of the state throughout Maryland and all across the country. This includes not only foster children such as Kanaiyah, but disabled adults such as Rashawn Williams who suffers from Down syndrome and is non-verbal. Mr. Williams was placed in a Residence Inn by Marriott in Silver Spring, Maryland that was being used as a group home. After he was able to leave the hotel unaccompanied, Mr. Williams spent six days trapped in an unlit storage room in a Metro station without access to food, water, or sanitation.[9]

**B. <u>Marriott Has the Contractual Ability and Demonstrated Practice of Ending Dangerous or Unauthorized Uses of Its Franchised Properties</u>**

78. Marriott is not a passive bystander to how its franchisees operate Residence Inn properties. Marriott's own franchise agreements—including the form of Residence Inn by Marriott franchise agreement (which, upon information and belief, is a standard agreement substantially similar to its franchise agreement for the Residence Inn JHMC) filed publicly with the U.S. Securities and Exchange Commission—vest Marriott with extensive, and in some respects unilateral, contractual authority to police, restrict, and terminate the uses to which its franchisees

---

[9] *See* Amended Complaint, *Hall et al. v. WeAchieve Inc. et al.*, No. 8:26-cv-142-PX (D. Md. Jan. 15, 2026), ECF No. 10.

put their hotels, including uses that threaten public health or safety.

79. Marriott's standard Residence Inn franchise agreement requires that a franchisee "use the Hotel premises solely for the operation of the Franchised Business and refrain from using or suffering the use of the premises for any other purpose or activity at any time." The use of a Residence Inn property to warehouse foster children for extended stays, in place of licensed, therapeutic, or family-based care, is not the operation of the Franchised Business that Marriott's own agreement contemplates or permits without Marriott's consent.

80. Marriott's franchise agreement further grants Marriott the right to "administer a quality-assurance program for the System that may include conducting periodic inspections of the Hotel and guest satisfaction audits and surveys to ensure compliance with System standards," and provides that a franchisee's "failure to maintain acceptable results in Franchisor's quality assurance program will be a material default," entitling Marriott to terminate the franchise.

81. Marriott's franchise agreement grants Marriott and its representatives the contractual right to enter the premises of any Residence Inn "at all reasonable times, with or without prior notice, for the purpose of conducting inspections." Marriott exercises this right regularly, including in matters involving threats to the well-being or safety of its guests. In one such instance, "Marriott headquarters" specifically intervened and directed an on-site Marriott-property manager to perform a "welfare check" on a guest, Noelle Glotfelty, who had checked into a Los Angeles-based Marriott property "amidst a mental health crisis," demonstrating that Marriott can and will take steps to keep its guests safe when necessary.[10]

82. Marriott's franchise agreement also requires franchisees to forward to Marriott,

[10] *Chapman v. Marriott International, Inc., et al.*, No. 23-stcv-03486 (Cal. Super. Ct. Jan. 22, 2024), available at https://rulings.law/rulings/judge-daniel-s-murphy/23stcv03486-2024-01-22.html.

within five days, copies of any government inspection reports, warnings, citations, or ratings indicating a failure to meet governmental standards or less than full compliance with any applicable law.

83. Most significantly, Marriott's franchise agreement grants Marriott the contractual right to terminate a franchise and order the immediate shutdown of a hotel—without affording the franchisee any opportunity to cure—whenever "a threat or danger to public health or safety results from the construction, maintenance or operation of the Hotel franchised hereunder, and an immediate shutdown of the Hotel is reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill."

84. Marriott's practice of exercising exactly this kind of contractual control is not theoretical. In August 2024, Marriott sued one of its own franchisees, Pride Hotel, LLC, in the United States District Court for the Southern District of New York, after Pride Hotel began housing migrants and asylum seekers under a contract with the City of New York, without first obtaining Marriott's consent.

85. Marriott's own franchise agreements with Pride Hotel provided that the franchisee could use the hotels "only for the operation of" the franchised brand "and not for any other purpose or activity without Marriott's prior approval."[11]

86. When Marriott learned that Pride Hotel had begun housing migrants and asylum seekers at the franchised properties without its consent, Marriott refused to authorize the unapproved use, confirmed the unauthorized occupancy through its own personnel, and imposed a list of conditions—including execution of a formal "Temporary Housing Facility Consent Agreement"—that Pride Hotel would have to satisfy before Marriott would even consider

---

[11] Complaint, *Marriott International, Inc. v. Pride Hotel, LLC, et al.*, No. 1:24-cv-05752-OEM-TAM (E.D.N.Y. filed Aug. 2, 2024), ECF No. 9.

permitting the alternative use to continue. When Pride Hotel failed to cure its defaults, Marriott terminated the franchise agreements and sued for liquidated damages, attorneys' fees, and other relief.

87. The Pride Hotel litigation confirms what Marriott's own franchise agreements already provide: Marriott actively monitors its franchised properties for unauthorized or unapproved uses, requires its consent before a franchisee may put a branded hotel to a use other than ordinary hotel operations, and is both willing and able to terminate a franchise when a franchisee uses its property in a manner Marriott has not approved.

88. Despite possessing this same contractual authority with respect to every Residence Inn in its system, including the Residence Inn JHMC, Marriott has not exercised it to prohibit or restrict the use of its franchised hotels to warehouse foster children—a practice that poses far graver risks to the health and safety of the vulnerable children.

89. To this day, disabled foster care children—just like Kanaiyah—could likewise be indefinitely housed in an unlicensed Marriott property virtually anywhere in this country besides Maryland. Marriott could end this dangerous practice immediately. It has not; instead, Marriott has chosen to profit from allowing foster children to be housed in its hotels without licensed care, qualified supervision, safety protections, and individualized services that their needs require.

## III. THE RESIDENCE INN JHMC: A HISTORY OF INSTITUTIONAL FAILURE

### A. The Residence Inn JHMC Was Built on Public Land, With Public Money, and Entrusted to a Developer with a Documented Record of Public Corruption

90. Years before Kanaiyah was improperly and unlawfully warehoused at the Residence Inn JHMC, the real property located at 800 North Wolfe Street—where the hotel would eventually be built—was a blighted parcel of land that caught the attention of one of Baltimore's most notorious real estate developers, Ronald Lipscomb, whose prior criminal history was a matter

of public record.

91. In 2009, for example, Mr. Lipscomb was charged in connection with a years-long City Hall corruption scandal. Lipscomb ultimately pleaded guilty to a campaign-finance violation, agreed to cooperate with the State Prosecutor's corruption investigation, received probation, and was banned from attending political events and contributing to political campaigns.

92. As part of his cooperation, Lipscomb also testified before a grand jury that he provided then–City Council President and future Mayor Sheila Dixon with thousands of dollars in cash and gifts during a period when Dixon held authority over tax breaks benefiting Lipscomb's projects. Mayor Dixon was subsequently charged with perjury and resigned as Mayor of Baltimore in early 2010.

93. In 2011, Lipscomb declared bankruptcy and dissolved his principal company, Doracon, leaving creditors unpaid. The State of Maryland separately barred another Lipscomb-controlled entity from doing business in the State.

94. These facts were public. They had been reported in the press, recorded in court files, and tied to the resignation of a sitting mayor. A background investigation—the kind a sophisticated global franchisor like Marriott routinely conducts before lending its brand and reputation to a property—would have disclosed them. Despite all of this, Marriott franchised its Residence Inn brand to an ownership group controlled by Lipscomb following a public-private land deal that conveyed the property located at 800 North Wolfe Street to Lipscomb for a mere $10.

95. Specifically, the property sat within the footprint of one of the most ambitious publicly backed redevelopment efforts in Baltimore's history: an 88-acre urban-renewal project overseen by East Baltimore Development, Inc. ("EBDI"). EBDI was financed through a combination of taxpayer dollars and private philanthropy for the purpose of redeveloping the East Baltimore neighborhood.

96. Lipscomb was embedded in the EBDI redevelopment from its earliest days. EBDI selected a master-developer partnership to oversee the simultaneous development of parcels across the 88-acre footprint, and Lipscomb was among the partners in that venture.

97. In 2015, EBDI conveyed the vacant block at 800 North Wolfe Street to a development company led by Lipscomb for nominal consideration of $10. Specifically, LSH Gateway, LLC and a number of related entities owned or controlled by Lipscomb (collectively, "LSH") obtained the rights to develop the real property located at 800 North Wolfe Street and turn it into a mixed-use development that would ultimately include the Residence Inn JHMC.

98. The conveyance to LSH represented a deliberate public investment pursuant to which a quasi-public development authority placed a parcel of mission-driven land in the hands of Lipscomb and his partners for virtually no consideration.

99. By the time EBDI entrusted Lipscomb with this public land and Marriott attached its name to the hotel project, Lipscomb's criminality was a matter of public record, discoverable through the most cursory diligence.

### B. <u>The Residence Inn JHMC Was Developed to House Vulnerable Guests, Including Foster Care Children</u>

100. Marriott, LSH, EBDI, the State of Maryland, and Lipscomb never conceived the hotel project as a general-purpose lodging facility. Rather, it was specifically conceived, marketed, and financed as a medical-adjacent hotel whose primary revenue stream would be generated by patients, caretakers, and medical professionals visiting the Johns Hopkins Medical Campus, one of the most concentrated and well-respected assemblages of medical institutions in the world.

101. In promoting the hotel, Hopkins Gateway commissioned a market feasibility study that described the Johns Hopkins Medical Campus as the largest generator of lodging room nights in the area and the dominant driver of demand for the hotel. The study expressly projected that the

hotel's guest base would consist substantially of: (i) outpatients and their caretakers traveling to Johns Hopkins Hospital; (ii) medical students, interns, fellows, and visiting physicians; and (iii) patients and families visiting the Kennedy Krieger Institute, an internationally recognized institution dedicated to children and adolescents with developmental disabilities.

102. The Residence Inn JHMC was specifically sited to exploit long-term demand for medical tourism. Indeed, its proximity adjacent to Johns Hopkins Hospital and the Kennedy Krieger Institute was the primary selling point to investors, lenders, and franchisors like Marriott. All of them knew, from the project's inception and throughout the hotel's operation, that a material portion of their guests would be, among others, children with disabilities, their families, and their caretakers, needing an extended-stay housing option.

103. As a hotel conceived to accommodate patients at the nearby Johns Hopkins Medical Campus and Kennedy Krieger Institute, the Residence Inn JHMC was specifically constructed and designed to align with that goal. For example, the hotel was, according to its developers, "specially designed with more ADA rooms than typically required in a standard Residence Inn to accommodate patients from the nearby Johns Hopkins Hospital." Thus, the developers claimed that in order "to meet the needs of nearby patients, the hotel's design relied heavily on input from Johns Hopkins and the adjacent Kennedy Krieger Center, resulting in rooms that do not follow the prototypical Marriott Residence Inn room design."

104. Marriott's deliberate co-location and co-branding of the hotel with the Johns Hopkins Medical Campus was no accident. This co-branding was a deliberate commercial and reputational choice by Marriott to associate its brand with the credibility, safety, and institutional integrity of Johns Hopkins.

105. It is also a common practice of Marriott to strategically co-locate and co-brand its Residence Inn properties near medical institutions whose names they explicitly bear, including the

Residence Inn Cleveland University Circle/Medical Center, the Residence Inn Morgantown Medical Center Area, the Residence Inn Houston Medical Center/NRG Park, the Residence Inn Durham Duke University Medical Center Area, the Residence Inn Phoenix Desert View at Mayo Clinic, the Residence Inn Jacksonville Mayo Clinic Area, the Residence Inn Rochester Mayo Clinic Area South, and the Residence Inn Tampa at USF/Medical Center.

106. Marriott's own marketing materials make explicit that the medical patient population is a core target demographic. The Residence Inn Pensacola Airport/Medical Center, for instance, advertises itself as serving guests whose purpose is "medical training" and/or "healthcare needs," describing itself as designed for the "extended stay guest."

107. The Residence Inn Cleveland University Circle/Medical Center is likewise marketed as an extended-stay hotel situated steps from the Cleveland Clinic and Case Western Reserve University Hospitals, catering to guests whose stays can range from days to weeks or months.

108. The Residence Inn Jacksonville-Mayo Clinic Area takes it a step further: it maintains a dedicated lounge specifically designed for medical guests' relaxation and socialization, offers a complimentary shuttle to the Mayo Clinic, and has partnered with an in-home nursing care provider to deliver personalized in-suite care to help guests transition from hospital to home.

109. Marriott's own marketing frames the hotel as a bridge between acute medical care and home recovery: "Wouldn't it be a blessing to have extra support while away from home? At Residence Inn you won't have to worry: You or your loved one will receive all the attention and extra care needed."

110. The Hotel Defendants thus did not stumble into serving a vulnerable population. They planned for it, projected it, financed the project on the strength of it, and collected revenue from it. The long-term residential placement of vulnerable children at this hotel was entirely

consistent with the guest profile that the Hotel Defendants had deliberately identified and targeted as their core demographic.

## C. The Residence Inn JHMC Has Been a Failed Hotel Since Its Opening

111. The Residence Inn JHMC eventually opened to the public in 2017.

112. Because LSH lacked the operational expertise to run a full-service Marriott-branded property, it originally retained Pyramid as its professional hotel manager for the Residence Inn JHMC pursuant to a hotel management agreement.

113. By the time the hotel opened under Pyramid's management, the development costs had reached a staggering $86.6 million, an extraordinary sum for an extended-stay hotel in one of Baltimore's most economically distressed neighborhoods.

114. Of the $86.6 million, $47 million came from more than 90 Chinese EB-5 investor-immigrants. These investors—who sued LSH for fraud—were promised two things: a profitable Marriott-branded hotel at the Johns Hopkins Medical Campus and a legal pathway to U.S. citizenship, neither of which materialized.

115. According to the Chinese investors, the inflated development costs were the product of self-dealing engineered by persons who controlled both sides of every transaction. The investors alleged in their fraud lawsuit that, within months of receiving investor funds, more than $2.8 million was siphoned to entities controlled by Lipscomb and over $572,000 to an entity controlled by a co-developer, under the cover of fictitious service fees.

116. From there, the Residence Inn JHMC routinely missed occupancy targets, average daily rate targets, and net operating income targets by orders of magnitude.

117. By 2023, the Chinese investors were told by LSH to expect "a near total loss, or a complete loss" of their $47 million investment, which the investors allege had been lost through mismanagement and self-dealing.

118. Rather than investing in a stable, trained workforce capable of maintaining a safe and secure property, the Chinese investors claim that LSH substituted a revolving door of contract laborers for a staff of trained employees, with contract labor costs reaching a staggering $360,849.06 by July 2025.

119. According to documents filed in the investor lawsuit: (i) LSH's Statement of Cash Flows for the period ending July 31, 2025 reflected a net change in cash from operating activities of negative $495,721.64 year-to-date, with the operating account alone declining by $277,029.80 in the single month of July; (ii) the Balance Sheet reflected a "Cumulative Deficit – Prior Owner" of $928,130.39, a "Retained Earnings Prior Years" deficit of negative $362,166.35, and a mortgage liability that had grown by $175,000 in a single month; and (iii) by July 2025, the hotel had unpaid accrued real estate taxes of $300,557.70, unpaid electric utility obligations of $233,930.28, and unpaid taxes totaling $143,326.41.

120. The hotel's problems extended far beyond its balance sheet. On or about November 17, 2024 (less than nine months before Kanaiyah was placed at the Residence Inn JHMC), Kierra Tripp was shot and killed inside the hotel during an unsanctioned hotel party. The following month, in December 2024, the hotel's Chinese EB-5 limited partners filed the aforementioned fraud lawsuit against Lipscomb and his associates.

121. The mismanagement ultimately proved too much. Pyramid was terminated as the hotel management company in December 2024 and was replaced by JHMD Associates LLC—an operating affiliate of GF Hotels & Resorts—who served as its replacement until July 2025, whereupon it too was replaced by Dimension.

122. Like Pyramid and JHMD before it, Dimension took over as the third-party hotel management company responsible for the day-to-day operation of the Residence Inn JHMC, including staffing, training, security, housekeeping, maintenance, and guest services, all subject to

Marriott's brand standards and operating systems, controls, and requirements. As is standard for management companies operating a franchised, branded hotel, Dimension stepped into the operational role previously held by Pyramid and JHMD, assuming responsibility for the property's on-site personnel and operations without altering the underlying franchise relationship between LSH and Marriott.

123. Marriott, for its part, was not a passive bystander to the deterioration of the hotel. Upon information and belief, the franchise agreement governing the Residence Inn JHMC required the franchisee to submit regular financial reports to Marriott, maintain books and records in accordance with Marriott's standards, and permit Marriott to audit those records on demand. Upon information and belief, Marriott reviewed these records and conducted regular audits of the Residence Inn JHMC's financial performance and was, thus, aware or should have been aware of the hotel's financial and operational stress.

124. Upon information and belief, Marriott has unfettered access to the Residence Inn JHMC's employee training records and monitored those records for compliance. Upon information and belief, Marriott did, in fact, routinely access and review these records, including training records relating to child welfare and safety and thus knew that the employees and contractors working at the Residence Inn JHMC did not comply with Marriott's training requirements.

125. Marriott's mandatory quality assurance program further required periodic on-site inspections of the property. Through these contractual mechanisms, Marriott had access to, and upon information and belief, actual or constructive knowledge of, the hotel's deferred maintenance obligations, its dangerous premises, the vulnerable foster children housed within its walls, its inability to sustain adequate staffing or adhere to Marriott-brand standards, and its declining operational and financial condition in the months leading up to Kanaiyah's death.

126. Despite the actual and/or constructive knowledge of the hotel's numerous failures,

Marriott took no meaningful corrective action. Upon information and belief, at no point did Marriott conduct an emergency quality assurance inspection of the hotel; place the franchise on probationary status or issue a notice of default; require its owners to demonstrate the financial capacity to operate a safe and brand-compliant property; or require enhanced security measures in response to the murder that had occurred on its branded premises. Instead, Marriott simply continued to collect massive franchise fees—$412,116.70 by mid-2025—while the hotel it branded deteriorated around a population of vulnerable and disabled children it knew were living inside neglected by those responsible for their care, in a neighborhood whose violent crime rate is five times the national average and which has been assigned an "F" crime rating by crimegrade.org.

### D. <u>Blue Jay and Excel Purchased the Distressed Residence Inn JHMC at a Foreclosure Sale That Has Been Challenged as Rigged</u>

127. With the hotel in severe financial distress, First National Bank of Pennsylvania initiated foreclosure proceedings against the hotel on or about September 24, 2024, claiming $18.4 million on the senior construction loan. Shortly thereafter, the hotel was placed in receivership and Pyramid was terminated as the hotel manager.

128. On or about June 25, 2025, the hotel was sold at a foreclosure auction to Blue Jay for approximately $10 million, against a development cost of $86.6 million.

129. In August 2025, the Chinese investors filed another lawsuit to set aside the foreclosure auction in Baltimore City Circuit Court. If successful in their claims, that lawsuit, which is currently on appeal, could result in rescission of various agreements resulting in ownership and control of the Residence Inn JHMC returning to Lipscomb and LSH.

130. The investors alleged that the June 25 auction was improperly rushed to benefit the buyer—Excel Group—a Virginia-based private equity firm linked to Blue Jay—the same entity that had purchased the senior loan from First National Bank of Pennsylvania months earlier. In

short, the investors alleged that the entity that acquired the senior debt (Blue Jay) and the entity that bought the hotel at foreclosure (Excel) were effectively the same, and that the auction was engineered to wipe out their $47 million subordinate investment at pennies on the dollar.

131. The investors further alleged that a pending transition to a new court-appointed receiver should have stayed the auction, and that the $10 million sale price was "unconscionably low" against a third-party appraisal valuing the hotel at $32.7 million. As of the date of this Complaint, the investors are still attempting to have the foreclosure sale set aside and, thus, claiming they (and the rest of their ownership group) are the rightful owners of the hotel.

132. After Excel and Blue Jay acquired the hotel at the foreclosure auction on June 25, 2025, they acquired not just title to a distressed physical property, but, upon information and belief, the full weight of ownership responsibility for an institution housing vulnerable guests, including, within weeks, a disabled minor child placed there by the PGDSS. Meanwhile, LSH, Lipscomb, and the Chinese investors relinquished total control over the property and its operations, despite claiming to be the rightful and beneficial owners of the hotel and the land on which it sits.

133. Upon information and belief, despite knowledge of, and acquiescence to, the hotel's practice of housing vulnerable children, as well as all of the other challenges the hotel was facing (financial, operational, reputational, etc.), Blue Jay and Excel made no material investment in the hotel's physical infrastructure, security or operational systems, including training systems, or staffing in the period between its acquisition and Kanaiyah's death on September 22, 2025.

134. Upon information and belief, Blue Jay and Excel did not (i) commission a safety assessment of the property; (ii) undertake any remediation of the physical plant deficiencies that had accumulated over years of financial mismanagement; (iii) enhance security measures notwithstanding the murder that had occurred on the premises less than nine months earlier; or (iv) mandate, review, or audit any policies or procedures concerning the hotel's care for and housing

of disabled children, including its child safety and welfare trainings.

135. Marriott, for its part, also made no material changes to its oversight practices of the Residence Inn JHMC following the sale to Blue Jay and Excel. Upon information and belief, Marriott failed to: (i) require Blue Jay or Excel to complete a Property Improvement Plan or otherwise condition continuation of the Residence Inn franchise license on remediation of the property's known physical and operational deficiencies; (ii) conduct a reinspection or quality assurance audit of the property following the change of ownership; or (iii) take any action in response to the hotel's known practice of housing vulnerable, state-placed children, including a review or audit of training programs concerning welfare and safety.

## IV. KANAIYAH'S EXPERIENCE WITH THE MARYLAND FOSTER CARE SYSTEM

### A. Kanaiyah's History of Mental and Physical Health Problems

136. Kanaiyah was born on December 23, 2008. She was an African American female resident of Prince George's County. At the time of her death inside the Residence Inn JHMC, she was just 16 years old.

137. Prior to her passing, Kanaiyah had spent over 3 years in the Maryland foster care system and was in the legal custody of the State of Maryland, with a documented history of serious mental illness. By taking Kanaiyah into foster care custody, the State of Maryland assumed a constitutionally recognized "special relationship" with her, giving rise to an affirmative duty under the Fourteenth Amendment to provide reasonably safe conditions and protection from foreseeable harm, including self-harm.

138. The physical evidence of Kanaiyah's struggle with self-harm was also plainly visible. Kanaiyah's arms bore visible self-inflicted scars, physical evidence of a sustained and serious struggle with self-harm that was known to every agency and provider charged with her care, as well as anybody who encountered her in person. Indeed, at the time of her death,

Kanaiyah's body had more than 50 healing rectilinear scars distributed across her wrists, arms, forearms, chest, abdomen, thighs, and legs.

139. Kanaiyah was also severely and visibly underweight. At the time of her death, she had a body mass index ("BMI") of approximately 17.0, clinically below the healthy weight threshold for an adolescent female and placing her in the 5th percentile for girls her age. At a BMI of 17.0, Kanaiyah's frail physical condition was observable without medical training and should have immediately prompted concern and intervention, especially from hotel workers trained on child welfare and safety.

140. Kanaiyah was also diagnosed with major depressive disorder, post-traumatic stress disorder, and experienced recurring suicidal ideation and behavior. These conditions required consistent supervision, prescription and non-prescription over-the-counter drugs, structured therapeutic support, and a physical environment that eliminated her access to means of self-harm.

**B. <u>PGDSS's Assumption of Custodial Responsibility of Kanaiyah</u>**

141. In the summer of 2022, a Maryland state juvenile court determined that Kanaiyah was a child in need of assistance due to, among other things, her history of mental health and behavioral issues and the fact that no parent, guardian, or custodian was able to provide the necessary care to meet her needs. She was adjudicated as a "Child in Need of Assistance" on August 2, 2022, and placed in the temporary custody of PGDSS, with a permanency plan of reunification. From that point forward, PGDSS bore custodial responsibility for Kanaiyah's safety and well-being.

142. PGDSS placed Kanaiyah in a series of residential therapeutic services at placements offering trauma-informed care for adolescents and young adults, including diagnostic-level mental health stabilization interventions and individual, family, and animal therapy.

143. Kanaiyah also required numerous hospitalizations while in State custody. And the

trajectory of these hospitalizations reflects the escalating gravity of her condition. On March 5, 2024, she was admitted for a psychiatric hospitalization following threats of harm to herself and others. She was promptly transferred to inpatient psychiatric care, where she remained from March 7 through March 15, 2024.

144. Within weeks of her discharge, Kanaiyah was hospitalized again, this time from April 11 through June 20, 2024—a period of over two months—for mental health evaluation and stabilization. PGDSS signed consent for her treatment and attended treatment team meetings during this hospitalization. She was hospitalized once more from April 29 through May 9, 2025. Each of these admissions was preceded by a crisis that required emergency clinical intervention.

145. Beginning in the summer of 2024, PGDSS periodically contracted for one-to-one services to provide additional support for Kanaiyah at her placements as well as during her inpatient hospitalizations.

146. In the months before her placement at the Residence Inn JHMC, Kanaiyah had been permanently residing in a group home in Prince George's County. In early August 2025, however, Kanaiyah experienced a severe psychiatric episode and was hospitalized as a result.

147. After 72 hours in the hospital, Kanaiyah was told that she did not meet the criteria for further inpatient hospitalization and was discharged. Kanaiyah, however, had nowhere to go, as PGDSS and Charles had not secured alternative housing for her.

148. PGDSS and Charles contacted various residential treatment centers, both within and outside Maryland, in an effort to secure appropriate placement for Kanaiyah. Those providers denied services for Kanaiyah based on the severity of her needs. Each denial represented a clinical determination by a licensed, specialized facility that Kanaiyah's needs exceeded what that facility could safely accommodate. In other words, Kanaiyah's behavioral challenges and psychiatric disorders were so severe that those upon whom the State most heavily relied to care for children

like Kanaiyah turned their backs on her.

149. Unable to find Kanaiyah a residential treatment center, group home, or foster home, Kanaiyah was placed by the State in the embattled Residence Inn JHMC on August 4, 2025, which had sold at foreclosure just five weeks prior.

### C. For Seven Weeks, Kanaiyah Lived Alone at the Residence Inn JHMC

150. For the seven weeks between August 4 and September 22, 2025, Room 1109 on the 11th floor of the Residence Inn JHMC was Kanaiyah's home. It is where she completed her homework; it is where she prepared and ate her meals; it is where she relaxed and unwound; and it is where she slept. Everything an ordinary child would do in his or her home, Kanaiyah did in Room 1109 of the Residence Inn JHMC.

151. Every morning after Kanaiyah woke up and started her day, she would leave the property and go to school. And just like her classmates, she would return to where she came at the end of the school day. Kanaiyah had no choice; she had no other place to go—no other place to call home.

152. Room 1109 was specifically designed to be Kanaiyah's home. The room—a studio suite—maintained all the attributes of traditional apartment living, including kitchen appliances, flatware, silverware, and numerous other amenities necessary to live in the hotel long-term. Kanaiyah also had access to the hotel's dedicated Children's House Lounge, a space specifically designed to give the feel of a "home away from home," where children can make free use of various "video gaming systems, a free food pantry, supplies, toys and a dining area."

153. For all intents and purposes, Kanaiyah lived in Room 1109 alone. The only adult supervision she received came in the form of a rotating cast of caregivers whose presence in the room was an express condition upon which her placement in the hotel was approved by the State. Specifically, as part of Kanaiyah's long-term placement at the Residence Inn JHMC, she was

supposed to receive continuous, 24-hour supervision from a one-on-one caretaker provided by a behavioral health contractor (Fenwick) who, upon information and belief, had provided similar care to other foster children at the Residence Inn JHMC and other hotels in the surrounding area.

154. In the referral request to Fenwick, PGDSS specifically documented Kanaiyah's behavioral challenges, including her history of running away, damaging property, and self-harm, and expressly directed that the one-on-one services should help Kanaiyah "build coping strategies and lessen the risk of suicide attempts." Kanaiyah's history of self-harm was disclosed and, indeed, obvious from her visible scarring. No one receiving this referral—or housing this child—could have been under any illusion about the level of supervision and care she required, or the consequences of failing to provide it.

155. Fenwick's own written, established organizational policies required its one-on-one staff to: (i) provide continuous, 24-hour supervision; (ii) conduct hourly in-person checks; (iii) remain awake during their entire shift—sleeping was expressly prohibited; and (iv) ensure that all patient medications were maintained in secure "lock box" storage at all times, precisely because Fenwick knew Kanaiyah had a documented history of suicidal ideation and prior attempts.

156. The configuration of Room 1109, however, made it impossible for Fenwick to adhere to its own policies. Room 1109 was a suite with a living room and kitchenette area separated from a bedroom and bathroom by an internal door. Under Fenwick's supervision model, the one-on-one staff member remained in the living area while Kanaiyah occupied the bedroom—a physical arrangement that guaranteed a structural gap between Kanaiyah and the person charged with her safety. Despite Kanaiyah's documented suicidal history, none of the Defendants took any steps to address the obvious risks posed by this suite configuration or her access to an unsupervised private space. Nor did any of the Defendants take steps to ensure medication lockboxes were available in Room 1109.

157. Kanaiyah's placement at the Residence Inn JHMC was supposed to be temporary and short-term. It was anything but that. PGDSS and placement specialists at the DHS Social Services Administration attempted to find a suitable long-term treatment center and/or residential facility, but by late August 2025 had failed to secure any. On or around August 20, 2025, Charles advised Kanaiyah's mother that PGDSS was "still at a roadblock regarding placement."

158. By that date, Kanaiyah had already been in the hotel for more than two weeks; no safe alternative placement had been secured; and the continued hotel arrangement depended on Fenwick's ability to provide continuous, competent, one-on-one supervision. At best, PGDSS managed to convince a single outpatient mental health clinic to complete the first stage of establishing a new "Certificate of Need" for Kanaiyah and had scheduled a follow-up clinical assessment for her to take place in late September 2025. Kanaiyah would not live to make it to that appointment.

159. As a result of the State's inability to find Kanaiyah a proper dwelling, she continued to reside at the Residence Inn JHMC, just as she would have lived in any other long-term dwelling establishment.

## D. <u>The Individualized Placement, Safety, and Escalation Decisions Concerning Kanaiyah</u>

160. The decision to place Kanaiyah in the Residence Inn JHMC was wrong and illegal, and it should never have happened. By no later than August 4, 2025, PGDSS, acting through Charles and other identified and unidentified caseworkers, supervisors, placement personnel, and decisionmakers, knew that Kanaiyah could not safely be treated as an ordinary hotel guest or placed in an unregulated setting without concrete, continuously enforced protective measures. Her case file, clinical history, referral materials, and recent placement history reflected major depressive disorder, post-traumatic stress disorder, recurrent suicidal ideation, prior attempts or self-harm,

visible self-inflicted scarring, repeated psychiatric hospitalizations, and the inability of multiple residential facilities to accept her because of the level of her needs.

161. Upon information and belief, Charles reviewed, prepared, received, transmitted, and/or had access to Kanaiyah's relevant case plan, court orders, placement history, clinical assessments, hospital-discharge information, referral materials, service-provider notes, and communications from Kanaiyah's mother. Upon information and belief, those materials identified Kanaiyah as a high-risk minor who required continuous supervision and an environment in which prescription and nonprescription medication, including readily available over-the-counter medication, should not be accessed without adult control.

162. Upon information and belief, Charles and the PGDSS personnel who approved and maintained the placement knew that the hotel was not itself a licensed child-care, residential-treatment, psychiatric, or medical facility and that Kanaiyah's safety depended, at least in part, upon the effective performance of Fenwick's promised supervision.

163. Upon information and belief, the decision to place and maintain Kanaiyah at the Residence Inn JHMC required approval, concurrence, authorization, review, or ratification by one or more of López, Charles, Turner, Does 1–10, and PGDSS supervisors or placement personnel. Each such person had access to information establishing: (i) Kanaiyah's heightened suicide and self-harm risk and prior history; (ii) the absence of a licensed residential placement; (iii) the unlicensed nature of the hotel placement; (iv) the indefinite duration of the placement; (v) Fenwick's role as the sole source of continuous supervision; and (vi) the need for safety controls, including reliable relief coverage, frequent in-person welfare checks, secure medication storage, and emergency-response capability.

164. Upon information and belief, López, Charles, Turner, and the relevant Doe defendants had authority, individually or through readily available supervisory escalation, to take

one or more of the following actions before Kanaiyah's death: request or require an emergency placement review; require a documented safety plan for the hotel stay; verify Fenwick's staffing, relief coverage, emergency-response qualifications, and medication-lockbox compliance; require heightened supervisory approval for continuation of the hotel placement; direct notification of PGDSS if Fenwick could not provide continuous coverage; request emergency clinical evaluation or hospital assessment; seek alternative respite, crisis, or residential placement; and escalate the matter to SSA, DHS, or other State placement authorities. Upon information and belief, none of those protective measures were required, implemented, or verified for Kanaiyah before September 22, 2025.

165. Upon information and belief, López, Charles, Turner, and other PGDSS personnel continued to receive or have access to hotel-stay, case-management, service-provider, and placement-status information confirming that Kanaiyah remained in the Residence Inn JHMC with no identified long-term placement available.

166. Upon information and belief, the relevant PGDSS supervisors, Turner, and the Doe defendants received, reviewed, or had ready access to reports identifying children in unlicensed hotel placements, the length of those placements, the providers responsible for one-on-one supervision, and the absence of appropriate licensed placements. Those reports, together with Kanaiyah's case materials, made it foreseeable that a breakdown in Fenwick's coverage, medication control, or emergency response would expose Kanaiyah to a substantial risk of serious injury or death.

167. Upon information and belief, PGDSS and SSA policies then in effect required, or contemplated, heightened reporting, review, and escalation when a child entered or remained in an unlicensed setting. Those mechanisms included notice to SSA and the Secretary's Office, recurring placement-status reporting, Rapid Response Meetings, weekly SSA placement meetings, local-

department visits, and/or other supervisory review. Kanaiyah's continued residence in an unlicensed hotel placed her within the population for whom those safeguards were intended. The State and County Defendants responsible for those mechanisms, including López, Charles, Turner, PGDSS, and PGDSS personnel, either failed to apply them to Kanaiyah, failed to ensure that they resulted in meaningful safety action, or permitted the placement to continue without the individualized protections her risk profile required.

168. Upon information and belief, Defendant Studstill, as Executive Director of SSA, received or had access to statewide and local-department reports, audit findings, hotel-stay data, vendor-oversight information, and escalation materials concerning children housed in unlicensed settings, including reports generated pursuant to the State's hotel-stay reporting and placement-review practices. Studstill was responsible for supervising local departments, implementing corrective measures identified by the Office of Legislative Audits, and ensuring that SSA's hotel-placement safeguards were implemented. He therefore had authority to require corrective action, enhanced monitoring, referral of noncompliant local departments, and emergency intervention for high-risk children remaining in unlicensed settings.

169. Upon information and belief, Defendant López, as Secretary of DHS, received or had access to reports, briefings, audit materials, hotel-placement data, and communications identifying the continued placement of children in unlicensed hotel settings, the use of unlicensed one-on-one vendors, the absence of adequate vendor oversight, and the risk to children whose health and safety depended on those arrangements. López had authority to direct SSA and local departments to impose immediate safety requirements, including verified staffing and relief coverage, medication-security protocols, emergency-response requirements, heightened placement review, suspension of unsafe vendors, and emergency relocation or cessation of hotel stays.

170. Upon information and belief, Defendants López, Studstill, Turner and PGDSS were

aware that, prior to Kanaiyah's death, the OIG was investigating the State of Maryland's practice of housing foster care children in unlicensed settings and were, thus, aware that the federal government believed these settings were not designed to care for children in foster care.

## V. KANAIYAH DIES ALONE IN HER HOTEL ROOM FOLLOWING NEGLECT BY HER STATE-PROVIDED CARETAKERS

171. On Saturday, September 20, 2025, Fenwick assigned a single caretaker to a 24-hour shift beginning at 10:00 a.m. When the caretaker scheduled to relieve that individual on Sunday, September 21, called out ill, Fenwick—acting through its supervisory and management staff, including Eric Fenwick—did not, upon information and belief, contact PGDSS or any Hotel Defendant, seek emergency coverage, or take Kanaiyah to a safe alternative setting, including the hospital across the street.

172. Upon information and belief, Fenwick's management, including Eric Fenwick, approved or permitted the continuation of the caretaker's assignment without adequate relief. Upon information and belief, PGDSS had no effective system requiring Fenwick to notify Charles, Turner, a supervisor, or any designated State or County official when continuous coverage for a high-risk minor broke down, when an assigned worker's shift was extended beyond safe limits, or when the provider could not ensure compliance with medication-lockbox and welfare-check requirements.

173. Upon information and belief, had Charles, Turner, a responsible PGDSS supervisor, or another State or County decisionmaker been notified that Fenwick's caretaker had been required to remain on duty for approximately 53 consecutive hours, that person had authority to direct Fenwick to obtain emergency coverage, arrange a clinical evaluation, move Kanaiyah to an emergency setting, require enhanced checks, contact emergency services, or otherwise prevent the supervision breakdown. No such notification, intervention, or safety response occurred.

174. As a result, Fenwick extended the already-spent Saturday worker's shift, requiring that single individual to provide continuous supervision of a suicidal adolescent for approximately 53 consecutive hours without relief. This 53-hour extension was an affirmative organizational decision made by Fenwick's management, including Eric Fenwick, rather than an isolated act of a low-level employee. It reflected Fenwick's de facto operational policy and practice of extending staffing assignments in lieu of maintaining adequate relief coverage for high-risk clients.

175. At approximately 5:45 a.m. on Monday, September 22, 2025, the assigned Fenwick caretaker—who had by that point been continuously on duty for nearly 44 hours—checked on Kanaiyah. She responded but did not get up. The caretaker did not perform any further welfare check until sometime after 10:00 a.m.—a gap of more than four hours, more than four times the maximum interval permitted by Fenwick's own policies. During that time, Kanaiyah was left entirely alone in her bedroom without supervision of any kind.

176. When the caretaker returned to the room after 10:00 a.m., Kanaiyah was no longer breathing. The caretaker called 911 for emergency assistance. When asked if Kanaiyah was breathing, the caretaker responded: "No . . . and she's cold." When asked if the worker could perform CPR, the response was: "I don't know how." In other words, Fenwick assigned a caretaker to provide around-the-clock, one-on-one supervision of a 16-year-old girl with a documented history of suicide attempts who did not possess basic CPR certification or emergency response training.

177. When emergency personnel arrived, they found Kanaiyah lying on her side in bed lifeless. At the foot of the bed was an empty bottle labeled diphenhydramine with an original quantity of 365 pills that the Fenwick caretaker had not secured. Pink pills were scattered across the bed and floor next to a suicide note. Emergency medical personnel pronounced Kanaiyah dead at 11:01 a.m. on September 22, 2025. She was 16 years old.

178. The Office of the Chief Medical Examiner subsequently determined that the cause of Kanaiyah's death was diphenhydramine intoxication, and the manner of death was suicide. The pharmacological effects of a diphenhydramine overdose of this magnitude include confusion, agitation, rapid heart rate, visual hallucinations, and, in severe cases, seizure, respiratory depression, and coma—effects consistent with a period of conscious awareness and suffering before the loss of consciousness that preceded her death.

## VI. THE STATE FINALLY EMPTIES ITS HOTELS OF FOSTER CHILDREN WHILE CONCEALING CRITICAL EVIDENCE CONCERNING KANAIYAH'S DEATH

179. The months following Kanaiyah's death have brought a series of institutional reckonings. Each confirms what Plaintiff alleges: that the failures that killed Kanaiyah were systemic, known, and preventable.

180. First, on September 24, 2025—two days after Kanaiyah died—the Maryland Department of Human Services ceased all referrals to Fenwick statewide and ultimately terminated its relationship with Fenwick altogether. These State actions, taken after Kanaiyah's death, confirm that the relevant decisionmakers possessed practical and legal means to act *before* her passing.

181. Second, on October 22, 2025, Governor Moore, through Secretary López, directed every local Maryland department of social services to immediately stop placing youths in unlicensed settings like the Residence Inn JHMC and to move every child still placed in a hotel into a permanent home by November 24, 2025.

182. Third, following Kanaiyah's death, the child protective services unit of the Baltimore City Department of Social Services conducted a formal investigation. The investigation found the allegation of child neglect to be "Indicated"—a substantiated finding defined as credible evidence of neglect that has not been satisfactorily refuted. The investigation identified three individual Fenwick staff members as primarily responsible for the neglect, due to approving the

53-hour shift extension and failing to ensure medications were secured in a lockbox as required by Fenwick's own written protocols. Pursuant to Human Services § 1-203 of the Maryland Code, DHS issued a public disclosure report (DHS/SSA Form 2037) confirming the neglect findings. On the very same day this report was released, the Baltimore City State's Attorney's Office publicly declined to file criminal charges in connection with Kanaiyah's death, claiming to have completed its own independent investigation—a position that is difficult to reconcile with the report's contemporaneous findings documenting the systemic failures that contributed to Kanaiyah's death.

183. And fourth, in direct response to Kanaiyah's death, the Maryland General Assembly passed legislation commonly referred to as "Kanaiyah's Law" which, among other things, prohibits the placement of foster children in unlicensed hotel settings statewide.

184. And fifth, in a subsequent op-ed published in The Imprint, Defendant Studstill personally confirmed that Maryland's elimination of hotel placements in October 2025 was the product of institutional knowledge and planning that long predated Kanaiyah's death, not a response to newly discovered information. Studstill wrote that Maryland "recognized" the need for the structural overhaul that ultimately ended the practice, and that doing so required only the political will to deploy, on an accelerated basis, remedial tools—provider rate restructuring, "Rapid Response Review Teams," and cross-agency hospital-overstay monitoring—that Maryland's own child welfare leadership already understood to be necessary. Studstill's admission that these reforms could have been, but were not, implemented with urgency before Kanaiyah's death is further evidence that Defendants' inaction was a knowing and deliberate institutional choice rather than an unavoidable oversight, supporting Plaintiff's claim for punitive damages.

185. These efforts are all part of Governor Moore's purported commitment to transparency and reform. But behind the public posture, Governor Moore's Administration has worked to shield from public view its own internal account of how a 16-year-old child in its custody

came to die alone in a hotel room.

186. In April 2026, in response to a public records request under the Maryland Public Information Act, DHS produced more than 600 internal emails concerning the agency's response to Kanaiyah's death. That production was riddled with extensive redactions that conceal the substance of the agency's internal deliberations at virtually every point that matters.

187. Among other things, (i) the first internal DHS email describing Kanaiyah's death was redacted so heavily that its contents cannot be discerned; (ii) internal DHS communications concerning how the agency would respond to press inquiries about Kanaiyah's death—communications in which the Governor's office was included—were redacted in their substance; (iii) communications reflecting Secretary López's directives and expressions of frustration concerning the termination of the State's relationship with Fenwick were likewise redacted; and (iv) internal emails questioning discrepancies in the agency's own count of foster children housed in hotels were produced with their substantive content blacked out.

188. The portions of the production the State did not redact are themselves damning. They reveal that DHS leadership was not informed of Kanaiyah's death until the afternoon of September 22, 2025, hours after authorities knew, and that as of the following morning Secretary López still had not been notified.

189. They further reveal that in the days and weeks after Kanaiyah's death, the agency could not reliably state how many foster children were housed in hotels in a given county on a given day, with staff circulating conflicting spreadsheets, questioning whether counts had changed overnight, and pleading, in the words of one staffer, "I need to know what information is correct."

190. The State's redactions conceal precisely the information that would reveal what its officials knew, when they knew it, and how they responded—including the substance of communications between DHS and the Governor's office in the critical days after Kanaiyah died,

when the agency's first instinct, on the face of the produced records, was to manage the story rather than account for the child. A State that professes transparency while blacking out its own account of a child's death in its custody is engaged in concealment, and that concealment continues to this day.

191. Through this action, Kanaiyah's mother, Brooke, seeks a full and honest accounting of how and why her beloved 16-year-old daughter—Brooke's only child—lost her life while in the State's custody at a hotel long known to be dangerous and unsuitable for vulnerable children.

## CAUSES OF ACTION

### COUNT I: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Substantive Due Process: Duty to Protect (U.S. Const., 14th Amendment)

(Against Defendants Moore, López, Studstill, Charles, Turner, Does 1–10, Eric Fenwick, and Roes 1–3, in their individual capacities)

192. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

193. 42 U.S.C. § 1983 provides a cause of action against every "person" who, acting under color of state law, deprives any individual of rights secured by the Constitution. Defendants Moore, López, Studstill, Charles, Turner, and Does 1–10 acted under color of state law in their capacities as Maryland state and county officials, and are sued in their individual capacities.

194. Defendants Eric Fenwick and Roes 1–3 also acted under color of state law. The State of Maryland delegated to Fenwick its non-delegable constitutional duty to provide custodial care and protection to Kanaiyah, a foster child in state custody. Fenwick performed that public function under a contract with PGDSS that defined the scope and terms of the custodial care and subject to the State's direction and oversight. Under these circumstances, Eric Fenwick and Roes 1–3, as personnel of Fenwick, acted under color of state law within the meaning of § 1983.

195. When the State of Maryland adjudicated Kanaiyah as a "Child in Need of

Assistance" and took her into its custody, it assumed a constitutionally recognized "special relationship" with her that gave rise to an affirmative duty under the Due Process Clause of the Fourteenth Amendment to provide reasonably safe conditions, adequate care, and protection from foreseeable harm—including self-harm. *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 199–200 (1989). Each individual Defendant named in this Count exercised authority over her placement and care and owed Kanaiyah an affirmative constitutional duty to protect her from harm.

196. The standard for liability in custodial care cases is deliberate indifference—conscious disregard of a substantial, known risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Each of the above listed Defendants knew of a substantial risk of serious harm to Kanaiyah, including a specific risk of death by suicide, and disregarded that risk through their individual actions and omissions taken under the color of state law, establishing deliberate indifference.

197. The above listed Defendants' deliberate indifference is established by, among other facts: (i) PGDSS caseworkers expressly instructing Fenwick to help Kanaiyah "build coping strategies and lessen the risk of suicide attempts"—establishing actual documented knowledge of her active suicide risk; (ii) the visible signs of Kanaiyah's previous instances of self-harm; (iii) the 2023 motel overdose of a 16-year-old Prince George's County foster child documented in *Y.A. v. Padilla*, known to DHS and PGDSS, placing these officials on notice of the risk of unsecured medications in such unlicensed settings; (iv) three consecutive "unsatisfactory" OLA audit ratings establishing institutional knowledge of systemic failures; (v) the September 12, 2025 OLA audit directly flagging hotel placements, unlicensed vendors, and absent background check procedures as serious safety deficiencies, ten days before Kanaiyah's death; (vi) permitting Kanaiyah to be supervised by a worker on a 53-hour continuous shift without verification, monitoring, or

oversight; (vii) failing to ensure medication lockbox protocols were followed despite Kanaiyah's documented history of suicidal ideation and prior attempts; (viii) the ongoing OIG investigation of Maryland's practice of housing foster children in hotels; and (ix) Defendant Studstill's own subsequent public admission that Maryland's child welfare leadership knew these placements inflicted "deeply dehumanizing disruptions" on traumatized youth and knew the specific remedial measures—including restructured provider rates and "Rapid Response Review Teams" capable of authorizing emergency intervention "within hours"—required to end the practice, yet chose to develop and implement those measures over a period of "years" rather than deploy them on an emergency basis to protect children, including Kanaiyah, still housed in hotels.

198. With respect to Defendant Moore more specifically, deliberate indifference is established by, among other facts: (i) his September 10, 2025 Board of Public Works vote authorizing millions of dollars to address the foster care placement shortage with knowledge that children were then housed in dangerous, unlicensed hotel settings described to him as "cruel" and "unnecessary"; (ii) his failure to exercise his direct supervisory authority over DHS Secretary López to order any immediate emergency protective measures for children in hotel placements during the twelve-day period between September 10 (after these placements were described to him as "cruel" and "unnecessary") and September 22, 2025; and (iii) the issuance of the October 22, 2025 cessation directive by individuals he directed and supervised—demonstrating that Moore had the ability to protect Kanaiyah before her death and did not exercise it.

199. Each of the above listed Defendants' deliberate indifference was a direct and proximate cause of Kanaiyah's death, depriving her of her life—the most fundamental right protected by the Fourteenth Amendment. Their conduct was reckless and callously indifferent to her federally protected rights.

**COUNT II: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Substantive Due Process: State Created Danger (U.S. Const., 14th Amendment)**

(Against Defendants López, Studstill, Turner, Charles, Does 1–10, Eric Fenwick, and Roes 1–3, in their individual capacities)

200. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

201. The Fourteenth Amendment's Due Process clause imposes § 1983 liability under the state-created danger doctrine when an individual acting under the color of state law, through affirmative conduct, creates or substantially increases the risk of harm to a specific individual, placing her in a position of greater danger than she would otherwise have occupied. As alleged in Paragraph 194, Defendants Eric Fenwick and Roes 1–3 acted under color of state law by performing the State's non-delegable custodial-protection duty pursuant to a contract with PGDSS.

202. Kanaiyah, as an adjudicated "Child in Need of Assistance," was in the legal custody of the State of Maryland at all times relevant to this Count. Because Kanaiyah was held in State custody, the governing standard of culpability is deliberate indifference.

203. The above listed Defendants took affirmative acts that directly placed Kanaiyah in a position of substantially greater danger than she would otherwise have faced. Specifically, acting under color of state law, the above listed Defendants affirmatively placed Kanaiyah—a high-risk, suicidal 16-year-old—in the following specifically dangerous conditions: a hotel that had been the scene of a fatal shooting less than nine months earlier; a financially distressed property undergoing forced ownership transition through foreclosure and receivership; under the supervision of an untrained contractor whose worker was on an extended 53-hour shift and who did not know how to perform basic life-saving care or where to locate life-saving medical equipment; with unsecured medications readily accessible; with no mechanism to be notified if the contractor's supervision arrangements broke down; and with no on-site staff trained to recognize or respond to psychiatric

distress or a medical emergency.

204. No reasonable state actor could have concluded that placing a known suicidal teenager in these conditions was consistent with constitutional obligations—particularly as the OIG investigated this very practice in Maryland. This affirmative placement decision created an objectively unreasonable danger—one already recognized by the *L.J. v. Massinga* consent decree prohibiting this placement—substantially greater than the danger Kanaiyah would have faced absent the above listed Defendants' actions.

205. The above listed Defendants knew their conduct affirmatively created this danger and chose to proceed. The danger they created acting under color of state law was a direct and proximate cause of Kanaiyah's death, depriving her of her fundamental liberty interest in life and bodily integrity protected by the Fourteenth Amendment.

206. Each Defendant's conduct was reckless and callously indifferent to her federally protected rights.

**COUNT III: DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)—Unconstitutional Policy, Custom, or Procedure and Failure to Train (*Monell* and *City of Canton*)**

(Against Defendants Prince George's County and PGDSS)

207. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

208. Prince George's County and PGDSS are local-governmental entities. They are proper defendants under 42 U.S.C. § 1983 for constitutional deprivations caused by their respective official policy, custom, or practice, including where they were on actual notice of a pattern of prior constitutional violations by their respective agents and employees and failed to take corrective action, e.g., through training, supervision, or discipline.

209. The County's policymaking authority over its own funding decisions, its approval

of funding in connection with hotel placements through the County budget process, its power of appointment over the PGDSS Director, and its exercise of County-funded case management functions independent of SSA's statewide role each establish that the policies, customs, and practices alleged below are attributable to the County as a local government entity.

210. PGDSS's policymaking authority over its own policies, procedures, training materials, and job aids; the hiring, firing, and disciplining of its employees; the selection of and retention of contractors and agents; and the quality control, investigations and administrative reviews, program evaluation, corrective and preventative action planning, monitoring and data analysis and reporting done by its Quality Assurance and Compliance Division independent of SSA's statewide role and using funding provided by the County establish that the policies, customs, and practices alleged below are additionally attributable to PGDSS as a local government entity.

211. *Widespread Custom or Practice*. Prince George's County and PGDSS maintained a widespread practice, persistent and well-settled enough to constitute a de facto policy with the force of law, of placing foster children—including high-risk and suicidal youth—in hotels under the supervision of untrained, unvetted one-on-one contractors. This practice was an established, budgeted, and documented institutional practice, not an isolated or unauthorized departure by line staff, and it operated continuously from at least 2017 through Kanaiyah's death in 2025.

212. Prince George's County and PGDSS policymakers had actual or constructive knowledge of this widespread practice, evidenced by the County-funded budget process that financed hotel placements, the successive OLA audit findings identifying the practice at the State level, the 2023 motel overdose documented in *Y.A. v. Padilla*, the *L.J. v. Massinga* consent decree categorically prohibiting a sister municipal government from housing any foster child in an office, motel, hotel, or other unlicensed facility, and Defendant Studstill's own subsequent public admission that Maryland's child welfare leadership had long recognized that hotel placements

inflicted serious harm on vulnerable youth and knew the specific institutional reforms required to end the practice years before the State actually implemented them. Despite that knowledge, Prince George's County and PGDSS did nothing to end the practice. This inaction in the face of known, persistent, and well-documented risk constitutes deliberate indifference.

213. *Failure to Train*. Prince George's County failed to ensure and PGDSS failed to provide adequate training for PGDSS caseworkers and supervisors in the following material areas. As to each area identified below, the training deficiency was specific and identifiable; Prince George's County and PGDSS were on actual or constructive notice—through the prior incidents, audits, and consent decree alleged above and below—that the specific deficiency was likely to result in constitutional violations of the kind that caused Kanaiyah's death; and Prince George's County's and PGDSS's continued, knowing failure to remedy each of the following deficiencies constitutes deliberate indifference:

(a) Mandatory pre-placement vetting and background-check requirements applicable to one-on-one vendors providing services to foster children in hotel settings. This deficiency was identified in the September 2025 audit and had been a documented systemic failure known to Prince George's County and PGDSS since at least the 2021 audit cycle, placing them on actual notice of the need for this specific training. Had PGDSS caseworkers and supervisors been trained to require and verify background checks, Fenwick's unvetted worker would not have been placed alone with Kanaiyah, and this training deficiency was therefore an actual and proximate cause of her death.

(b) The requirement for, and assessment and verification that, any contractor assigned to supervise a high-risk youth in a hotel setting possessed basic

emergency response skills, including CPR certification. Given the documented population of suicidal and self-harming youth placed in hotel settings, the need for this training was obvious and, independently, was known to Prince George's County and PGDSS through the pattern of prior incidents alleged herein. Had this training been provided, PGDSS caseworkers would have required Fenwick's staff to possess basic emergency response skills, and the absence of that requirement was an actual and proximate cause of Kanaiyah's death.

(c) The requirement to assess whether hotel suite configurations—including the suite's separate sleeping and living areas—were compatible with continuous, unobstructed one-on-one supervision of a youth with a documented history of suicidal ideation and self-harm. Prince George's County and PGDSS were on actual or constructive notice of this deficiency through the 2023 motel overdose documented in *Y.A. v. Padilla* and the *L.J. v. Massinga* consent decree's categorical prohibition on hotel placements. Had caseworkers been trained to assess suite configurations for this purpose, Kanaiyah would not have been left in a hotel suite layout that permitted her to be out of her one-on-one worker's sight, and this deficiency was an actual and proximate cause of her death.

(d) The requirement to require, verify, or document the implementation of medication security protocols (including lockbox storage) for any youth with a history of self-harm or suicidal behavior placed under contractor supervision in a hotel setting. This deficiency was known to Prince George's County and PGDSS through the 2023 motel overdose documented in *Y.A. v.*

*Padilla*, in which a 16-year-old Prince George's County foster child overdosed twice on unsecured medications in a motel room under one-on-one contractor supervision. Had this training been provided, medication would have been secured in Kanaiyah's placement, and the absence of that training was an actual and proximate cause of her death.

(e) The requirement to establish or document any mechanism for being notified if a contractor experienced a staffing failure, shift-extension, or lapse in supervision coverage during a hotel placement. Prince George's County and PGDSS were on actual or constructive notice of the need for such a mechanism given the inherent risks of unsupervised one-on-one contractor placements documented in the audits and consent decree alleged herein. The absence of any such mechanism left the County structurally unable to intervene when Fenwick extended a single worker's shift to 53 consecutive hours, and this training and system deficiency was an actual and proximate cause of Kanaiyah's death.

214. *Failure to Supervise*. Prince George's County and PGDSS had actual or constructive knowledge that PGDSS caseworkers were placing high-risk foster youth, including suicidal teenagers, in unlicensed hotel settings under unvetted one-on-one contractors, and that this practice posed a pervasive and unreasonable risk of serious constitutional injury. Notwithstanding that knowledge, Prince George's County and PGDSS were deliberately indifferent to that risk and failed to supervise PGDSS caseworkers in the following material respects, each of which was an actual and proximate cause of Kanaiyah's death:

(a) Failing to establish any review or approval process for hotel placements of youth classified as high-risk or suicidal. As a result, the decision to place

Kanaiyah, a known suicidal teenager bearing more than fifty visible self-harm scars, in an unmodified hotel room under a contractor that had not been vetted or background-checked, was made without any meaningful supervisory review. Had such a review process existed, Kanaiyah's placement would have been flagged and prevented, and its absence was an actual and proximate cause of her death.

(b) Failing to establish or maintain any mechanism for monitoring contractor compliance with supervision, medication security, and staffing protocols during the placement. This left no means by which PGDSS could detect, in real time, whether Fenwick was meeting its contractual and legal obligations, and this absence was an actual and proximate cause of Kanaiyah's death.

(c) Failure to ensure PGDSS was notified of, and its resulting inability to take action in response to, Fenwick's extension of the already-fatigued assigned worker's shift to 53 consecutive hours, because no notification mechanism had been established. Had such a mechanism existed, PGDSS could have intervened before Kanaiyah's death, and its absence was an actual and proximate cause of that death.

215. *Failure to Discipline and Ratification*. Upon information and belief, no discipline was imposed in connection with the 2023 *Y.A. v. Padilla* case, known to Prince George's County and PGDSS, documenting a 16-year-old Prince George's County foster child's two overdoses on unsecured medications in a motel room under one-on-one contractor supervision—a virtually identical constitutional violation that gave Prince George's County and PGDSS actual notice, well before Kanaiyah's placement, of the specific risk that materialized when she died. That pre-existing

notice, combined with the successive audit findings, placed Prince George's County and PGDSS on actual notice that a policy or practice of not disciplining caseworkers, supervisors, or contracted personnel for hotel-placement failures was substantially certain to result in a repeat constitutional violation.

216. Despite that pre-existing notice, upon information and belief, Prince George's County and PGDSS failed to impose any discipline on PGDSS employees, supervisors, or contracted personnel in response to the 2023 incident or the documented pattern of constitutional violations associated with hotel placements more broadly. This continued failure to discipline in the face of known, similar prior violations constitutes deliberate indifference and was an actual and proximate cause of Kanaiyah's death, because it communicated to PGDSS caseworkers, supervisors, and contractors that hotel-placement failures carried no consequences.

217. That Prince George's County and PGDSS, upon information and belief, took no disciplinary or corrective action against Fenwick following the 53-hour shift extension and Kanaiyah's death until two days after her death further demonstrates that the authority to discipline and terminate contractors existed throughout Kanaiyah's placement and was simply never exercised. Though this post-death action is not itself the source of Defendants' pre-existing notice, it corroborates that the failure to discipline was a deliberate policy choice rather than an isolated oversight.

218. The widespread custom, failure to train, failure to supervise, and failure to discipline alleged above each independently constitutes an unconstitutional policy, custom, or practice of Prince George's County and PGDSS, and each was a moving force behind, and an actual and proximate cause of Kanaiyah's death.

**COUNT IV: DEPRIVATION OF MARYLAND CONSTITUTIONAL RIGHTS (Md. Decl. of Rights, art. 24)**

(Against Defendants Moore, López, Studstill, Charles, Turner, Does 1–10, Eric Fenwick, and Roes 1–3, in their individual capacities)

219. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

220. Maryland recognizes a direct cause of action for damages against individual state officials in their personal capacities for violations of the Declaration of Rights. *See Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520 (1984). As alleged in Paragraph 194, Defendants Eric Fenwick and Roes 1–3 acted under color of state law by performing the State's non-delegable custodial-protection duty pursuant to a contract with PGDSS.

221. Article 24 of the Maryland Declaration of Rights protects the rights to life, liberty, and property and is the state constitutional analog to the Fourteenth Amendment's Due Process Clause.

222. The individual Defendants deprived Kanaiyah of her rights to life, liberty, and personal security protected by Article 24 by placing a known suicidal minor in an unlicensed hotel setting with an untrained contractor, without medication security, without a monitoring mechanism, and without treating her health and safety as paramount, while ignoring documented warnings of the lethal danger of this practice.

223. With respect to Defendant Governor Moore, his attendance and participation at the September 10, 2025 Board of Public Works vote established actual knowledge of the dangerous conditions under which children in state custody—including Kanaiyah—were then being housed. His failure to exercise his direct executive authority over DHS during the twelve days between that vote and Kanaiyah's death, combined with his administration's prompt post-death directive demonstrating that authority existed and was available, constitutes willful and reckless disregard

of Kanaiyah's rights under Article 24 of the Maryland Declaration of Rights.

224. The conduct of each named Defendant was willful, reckless, and in conscious disregard of Kanaiyah's fundamental rights. As a direct and proximate result, she died.

## COUNT V: VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3604)

(Against Defendants Marriott, Blue Jay, Excel, Dimension; and Against LSH (in the alternative))

225. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

226. The Fair Housing Act prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Discrimination under the FHA includes the refusal or failure to make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

227. The Residence Inn JHMC constituted a "dwelling" within the meaning of the FHA, 42 U.S.C. § 3602(b), with respect to Kanaiyah's occupancy. She resided in the hotel suite for seven weeks under a State-funded, open-ended residential care arrangement, with no other home. For the reasons discussed at length above, the Residence Inn JHMC was, for all practical and legal purposes, her dwelling.

228. Kanaiyah was a person with a "handicap" within the meaning of 42 U.S.C. § 3602(h). She had a documented physical or mental impairment—including severe mental health conditions and a documented history of suicidality—that substantially limited one or more major life activities, including caring for herself, interacting with others, and regulating her behavior. She had a record of such impairment, and was regarded as having such impairment, as reflected by her

being placed in state-custody and the mandatory one-on-one supervision requirement attached to her placement.

229. Defendants knew, or should have known, of Kanaiyah's disabilities and the nature of her placement. Upon information and belief, Charles, Fenwick, and/or Roe informed the Hotel Defendants and Fenwick that Kanaiyah was a child with a disability and whose housing needs required special attention and treatment, including making various accommodations to ensure that, as a child with a disability, the room in which she was housed was suitable and safe for her long-term living. Beyond that, the need for accommodation was open and obvious: the continuous presence of Fenwick supervision workers around the clock, PGDSS's booking and payment of the suite as a long-term residential placement for a state-custody minor, the openly visible one-on-one supervision arrangement, her frail physical appearance and noticeable scarring from self-harm, and the fact that the hotel was specifically designed to accommodate long-term medical guests, all provided Defendants with further knowledge (actual or constructive) of her qualifying disability and her need for accommodation.

230. Despite Charles, Fenwick, and/or Roe having, upon information and belief, informed the Hotel Defendants of Kanaiyah's disabilities and need for accommodations in order for her to be safely housed at the Residence Inn JHMC, the Defendants failed to make any reasonable accommodation for Kanaiyah's known disabilities. Reasonable accommodations that were available, would not have fundamentally altered the nature of the hotel's services, and were necessary to afford Kanaiyah an equal and safe opportunity to use and enjoy her dwelling included, without limitation:

(a) Establishing a formal communication protocol between hotel management and Fenwick supervision workers regarding emergency procedures, gap coverage, and welfare monitoring;

(b) Providing or identifying a secure medication storage solution at the suite level, given the known presence of supervised medications in the room;

(c) Implementing enhanced monitoring or periodic welfare check protocols for the relevant floor;

(d) Training hotel personnel to recognize and respond to mental health distress and supervision gaps;

(e) Designating a hotel point of contact for PGDSS and Fenwick personnel for emergency escalation;

(f) Assessing whether the hotel's safety and security profile, including the access control failures evidenced by the Tripp murder, was compatible with long-term residential placement of a vulnerable and disabled minor, and remediating any identified risks;

(g) Ensuring that any person responsible for caring for, or overseeing the care of, a vulnerable minor is trained in basic emergency medicine, including the administration of CPR;

(h) Ensuring that basic, life-saving medical equipment (i.e., defibrillator) was available and accessible to any person responsible for caring for, or overseeing the care of, a vulnerable and disabled minor; and

(i) Ensuring that all hotel rooms housing vulnerable minors have been retrofitted to eliminate barriers that limit or restrict the visibility of the person responsible for caring for, or overseeing the child.

231. Each of these accommodations was reasonable in that it imposed minimal cost or operational burden on Defendants and the hotel and would not have fundamentally altered the nature of the hotel's services. This is especially true as to the Residence Inn JHMC, which was

specifically designed to exceed minimum disability standards in order to accommodate the vulnerable guests the property targeted. Each was necessary to afford Kanaiyah an equal and safe opportunity to use and enjoy her dwelling given her documented disabilities and suicidal history.

232. Defendants' failure to accommodate Kanaiyah's disabilities was a proximate cause of her death. Had Defendants provided any of the accommodations identified above, the supervision gaps that allowed her to access and consume a fatal quantity of diphenhydramine would have been detected, interrupted, or prevented, and the ability to provide life-saving emergency medical care would have been available to the caretaker.

233. As a direct and proximate result of Defendants' violations of the Fair Housing Act, Kanaiyah suffered severe pain and suffering and death, and Plaintiff has sustained the damages set forth herein. Defendants' acts and omissions were in willful, malicious, wanton, reckless, or callous disregard of Kanaiyah's rights. Plaintiff is entitled to compensatory damages, punitive damages, and attorney's fees and costs pursuant to 42 U.S.C. §§ 3613(c)(1) and (c)(2).

## COUNT VI: NEGLIGENCE AND GROSS NEGLIGENCE BY STATE AND COUNTY EMPLOYEES

(Against Defendants López, Studstill, Turner, Charles, and Does 1–10)

234. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

235. Defendants López, Studstill, Turner, Charles, and Does 1–10 each owed Kanaiyah a duty of reasonable care in the administration of Maryland's foster care system and the specific placement and supervisory decisions made about her care.

236. They breached that duty by:

(a) Placing Kanaiyah in an unlicensed hotel setting;

(b) Entrusting Kanaiyah to an unqualified vendor, Fenwick, whose employees

were not trained in basic emergency medicine procedures;

(c) Failing to require proper protocols for the supervision of Kanaiyah;

(d) Failing to ensure Fenwick and its employees followed Fenwick's protocols;

(e) Failing to ensure Kanaiyah was placed in a setting with appropriate safeguards and protections necessary for the safety of a disabled minor with a history of suicidal behavior;

(f) Failing to ensure Kanaiyah's medications were secured, and

(g) Failing to take corrective action in the face of repeated documented warnings—including three consecutive "unsatisfactory" audit ratings, an active federal lawsuit documenting an identical prior incident, and a consent decree prohibiting the very practice employed—that placing at-risk foster children like Kanaiyah in unlicensed hotel settings endangered their safety.

(h) Failing to deploy, on an emergency basis for Kanaiyah, the specific remedial tools that Defendant Studstill has since publicly admitted Maryland's child welfare leadership knew were necessary to protect children in hotel placements, including rapid-response clinical intervention teams capable of authorizing emergency staffing or placement "within hours."

237. These acts and omissions were, at minimum, negligent and additionally reflect wanton and reckless disregard for Kanaiyah's life, rising to the level of gross negligence. That disregard is confirmed by Defendant Studstill's own published admission that Maryland's child welfare leadership recognized the dangers of hotel placements and possessed the specific remedial tools—including emergency "Rapid Response Review Teams" capable of authorizing intervention "within hours"—needed to protect children like Kanaiyah, yet chose to phase in those tools over a period of years rather than deploy them on an emergency basis to protect children then in harm's

way.

238. These acts and omissions are a direct and proximate cause of Kanaiyah's death, which was foreseeable and presaged by the very warnings these Defendants ignored. Each is personally liable for compensatory damages and, where the evidence supports actual malice or wanton disregard, punitive damages.

239. Under Maryland law, including the Local Government Tort Claims Act, the Maryland Tort Claims Act, and Maryland common law, López, Studstill, Turner, Charles, and Does 1–10 can each be held liable for their negligent and grossly negligent acts.

240. Written notice of claim has been served on Prince George's County on April 13, 2026 pursuant to Md. Code, Cts. & Jud. Proc. § 5-304(b).

241. Written notice of claim has been submitted to the Treasurer of the State of Maryland pursuant to Md. Code, State Gov't § 12-106(b) on January 9, 2026.

242. As a further direct and proximate result of López's, Studstill's, Turner's, Charles's, and Does 1–10's acts and omissions, Plaintiff has suffered the damages set forth herein, including Kanaiyah's conscious pain and suffering before death, the loss of her life, and all economic and non-economic losses sustained by her Estate and her surviving parent. Plaintiff is entitled to compensatory and punitive damages without limitation to any statutory cap.

## COUNT VII: NEGLIGENCE AND GROSS NEGLIGENCE BY FENWICK DEFENDANTS

(Against Defendants Fenwick Behavioral Services, LLC, Eric Fenwick, and Roes 1–3)

243. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

244. Fenwick, through its contract with PGDSS, assumed a duty to provide continuous, 24-hour supervision and behavioral support to Kanaiyah, a known suicidal teenager, specifically

directed to build coping strategies and reduce the risk of suicide attempts. Fenwick, Eric Fenwick, and Roes 1–3 breached every material element of that duty: (i) Fenwick assigned a single worker to supervise Kanaiyah for 53 consecutive hours, violating its own policies and rendering adequate supervision functionally impossible; (ii) upon information and belief, Fenwick did not notify PGDSS or any responsible party of its staffing crisis; (iii) Fenwick failed to ensure medications were secured in a lockbox as required by its own written protocols; (iv) Kanaiyah's caretaker employed by Fenwick did not conduct hourly wellness checks on her, leaving Kanaiyah unsupervised for over four hours on the morning of September 22, 2025; and (v) Kanaiyah's caretaker employed by Fenwick was not trained in CPR and was unable and unwilling to perform life-saving resuscitation, and was otherwise unable to locate life-saving medical equipment.

245. Fenwick's and Eric Fenwick's conscious decision to assign a fatigued worker to a 53-hour continuous shift supervising a known suicidal teenager—without informing social services, without ensuring medication security, and without verifying CPR capability—constitutes a wanton and reckless disregard for Kanaiyah's life. Eric Fenwick is personally liable based on his personal authorization of the staffing decisions at issue. These breaches were a direct and proximate cause of Kanaiyah's death.

246. As a further direct and proximate result of Fenwick's, Eric Fenwick's, and Roes 1–3's acts and omissions, Plaintiff has suffered the damages set forth herein, including Kanaiyah's conscious pain and suffering before death, the loss of her life, and all economic and non-economic losses sustained by her Estate and her surviving parent. Plaintiff is entitled to compensatory and punitive damages without limitation to any statutory cap.

## COUNT VIII: NEGLIGENCE BY DIMENSION

(Against Defendant Dimension)

247. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth

fully herein.

248. At the time of Kanaiyah's death on September 22, 2025, Dimension was the hotel management company of the Residence Inn JHMC and, in that capacity, was the primary day-to-day operational manager of the hotel.

249. As the hotel management company, Dimension bore direct, continuous, and comprehensive (albeit not exclusive) responsibility for the hotel's staffing, staff training, security, physical plant maintenance, guest relations, and compliance with applicable Marriott brand standards and legal requirements. In that capacity, Dimension owed Kanaiyah four independent, overlapping, and reinforcing duties of care, each of which elevated the applicable standard beyond that of ordinary negligence.

250. As the functional innkeeper of the hotel, Dimension owed Kanaiyah the affirmative duty to protect her from foreseeable harm, a duty grounded in the special relationship between innkeeper and guest that requires not merely the absence of negligence, but the active exercise of protective measures necessary to keep guests safe. This duty encompassed the obligation to inspect for, and remediate, dangerous conditions, warn of known hazards, take affirmative steps to prevent foreseeable harm, and ensure that the premises were reasonably suited to the needs of each guest Dimension accepted, including the vulnerable foster care children housed inside.

251. Maryland law imposes a heightened duty of care on all persons and entities who accept responsibility for minor children on their premises. Dimension had actual, daily operational knowledge of the ongoing presence of minor children placed at the hotel in residential psychiatric and behavioral treatment—children whose age, developmental status, and diagnosed conditions required a standard of care fundamentally different from that owed to adult commercial guests. That awareness imposed on Dimension an affirmative obligation to ensure that the conditions under which those children were housed were appropriate for their age, vulnerability, and specific needs.

252. Dimension assumed a further heightened duty of care by virtue of its status as the managing operator of a property it knew was being used as a de facto residential treatment facility for children with serious psychiatric and behavioral conditions. Under the doctrine of negligent undertaking, Dimension's voluntary assumption of operational management of a property serving this population obligated it to perform that undertaking with the degree of care appropriate to the risks it assumed.

253. Dimension assumed an independently elevated duty of care by virtue of its actual and constructive knowledge that Kanaiyah was a specific guest whose disabilities, including serious psychiatric conditions, substantially limited her capacity for self-protection and required a controlled physical environment, specialized supervision, and clinical intervention on a continuous basis.

254. Dimension breached each of these duties by failing to take any reasonable steps to ensure the safety and security of Kanaiyah while she was housed at the Residence Inn JHMC for residential psychiatric and behavioral treatment. Upon information and belief, Dimension failed to:

(a) Conduct, commission, or require any formal safety assessment or risk evaluation of the hotel's suitability for use as a residential setting for children with serious psychiatric conditions prior to accepting and continuing to accept such placements;

(b) Assess whether the physical configuration, fixtures, furnishings, and amenities of the hotel were safe for occupancy by children at elevated risk of self-harm and psychiatric crisis and who required continuous 24-hour supervision;

(c) Require, install, or provide locked or otherwise secured medication storage in the rooms occupied by child residents, despite the well-recognized risk

that pediatric psychiatric patients may access and misuse medications as a means of self-harm, and despite the widespread use of secured medication storage as a basic safety requirement in residential behavioral health settings;

(d) Require Fenwick to implement a controlled medication management program governing the storage, dispensing, documentation, and monitoring of all medications, including over-the-counter antihistamines such as diphenhydramine, accessible to child residents at the hotel;

(e) Ensure that no medications, whether prescription or over-the-counter, were stored unsecured in the rooms of child residents, and failed to prohibit child residents from possessing or self-administering medications without direct clinical supervision;

(f) Establish a secure, dedicated floor or wing of the hotel for use by child residents, with controlled access and physical separation from the general hotel population;

(g) Require Fenwick or other contractors providing medical or behavioral health services to maintain licensed and trained clinical staff on-site on a continuous, twenty-four-hour basis, including during overnight hours, and failed to take any steps to verify that adequate staffing was being provided;

(h) Require Fenwick or other contractors providing medical or behavioral health services to maintain minimum staff-to-resident ratios adequate to supervise and protect minor residents at all times, including contingency coverage obligations in the event of staff callouts or emergencies;

(i) Require Fenwick or other contractors providing medical or behavioral health

services to provide hotel management with individualized crisis plans, behavioral intervention plans, or safety profiles for each child resident—including Kanaiyah, which would have allowed hotel staff to recognize and respond to behavioral warning signs and imminent safety risks;

(j) Train hotel staff, including front desk personnel, security officers, housekeeping, maintenance, and supervisors, to recognize the behavioral warning signs of psychiatric crisis, suicidal ideation, and self-harm in minors, including the visible physical signs of prior and ongoing self-harm that were plainly observable on Kanaiyah's body throughout her residence at the hotel;

(k) Ensure that hotel staff completed all required, Marriott-mandated training obligations;

(l) Train hotel staff and on-site contractors, including Fenwick or other contractors providing medical or behavioral health services, in crisis de-escalation, trauma-informed care, or basic emergency response, including CPR;

(m) Maintain life-saving medical equipment (i.e., defibrillator) for hotel staff and on-site contractors, including Fenwick or other contractors providing medical or behavioral health services, to use in the event of a medical emergency;

(n) Establish any system of regular communication between hotel management and Fenwick regarding the condition, behavioral status, and individualized risk profiles of child residents housed at the hotel;

(o) Conduct any periodic safety inspections or joint audits of the conditions

under which child residents were being housed and supervised at the hotel; and

(p) Take any steps to monitor whether Fenwick was fulfilling its obligations to maintain the safety and welfare of the children in its care.

255. Dimension's failures constituted a systemic, total, and sustained abdication of the duties it assumed when it accepted management responsibility for a distressed property it knew was being used to house and treat the most vulnerable category of guests imaginable. The breaches enumerated above that bear a direct causal nexus to Kanaiyah's death—in particular (although not limited to), the failure to require secured medication storage, the failure to verify or monitor Fenwick's supervision and staffing arrangements, and the failure to ensure that personnel responsible for Kanaiyah's care possessed basic emergency response skills, including CPR—were each independently a direct and proximate cause of the unsafe conditions under which Kanaiyah was housed and that led to her death.

256. Specifically, as a direct and proximate result of Dimension's breaches of its duties of care, Kanaiyah was left entirely unsupervised in her hotel room during a gap of more than four hours (more than four times the maximum interval permitted by Fenwick's own policies) during which time she accessed and consumed a fatal quantity of diphenhydramine that had not been properly secured, and died as a result.

257. As a further direct and proximate result of Dimension's negligence, Plaintiff has suffered the damages set forth herein, including Kanaiyah's conscious pain and suffering before death, the loss of her life, and all economic and non-economic losses sustained by her Estate and her surviving parent.

**COUNT IX: NEGLIGENCE BY BLUE JAY DEFENDANTS**

(Against Defendants Baltimore Blue Jay 1, LLC and Excel Group, LLC)

258. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

259. From and after June 25, 2025, Blue Jay and Excel Group (referred to collectively as "Blue Jay Defendants" for purposes of this Count, as their interests and actions are, upon information and belief, effectively indistinguishable) owned, controlled, and held ultimate authority over the real property and improvements comprising the Residence Inn JHMC at 800 North Wolfe Street, Baltimore, Maryland.

260. Blue Jay Defendants acquired that ownership through a foreclosure auction with full, actual knowledge of the hotel's deteriorated physical condition, its years of financial collapse and operational neglect, its unresolved security deficiencies, the murder of Kierra Tripp on its premises less than nine months earlier, and its ongoing and recurring use as a residential placement facility for vulnerable minor children in state custody. In fact, the neglected condition of the hotel was precisely what drove Blue Jay Defendants' interest in acquiring the property in the first place.

261. Blue Jay Defendants' strategy as a hotel owner is to "acquir[e] well located, under-performing assets at a discounted basis." Just months before Blue Jay Defendants acquired the Residence Inn JHMC, Excel's founder and principal Shoham Amin described the company's acquisition strategy as follows: "We think that, combined with brand pressure to renovate, along with capital stack pressure from investors and the end of fund life there are deals that will clear the market, and with what we believe will be attractive pricing, and in some cases distressed pricing." In other words, Blue Jay Defendants' acquisition of the Residence Inn JHMC was not an arm's-length purchase of an unknown asset; it was an intentional, calculated acquisition (at a fire sale price) of a failing hotel that functioned as a de facto foster home and medical treatment center.

262. As owner of the hotel, Blue Jay Defendants owed Kanaiyah four independent and reinforcing duties of care, each elevated beyond that of ordinary negligence by the specific circumstances of the hotel and the population it housed.

263. As owner of a property operated as a public lodging establishment, Blue Jay Defendants assumed the affirmative duty of an innkeeper to protect guests from foreseeable harm. A property owner cannot discharge this duty by contracting away day-to-day management to a third party while retaining ownership, title, and the financial benefits of the enterprise.

264. Maryland law imposes a heightened duty of care on all persons and entities who accept responsibility for minor children on their premises. Excel, through its pre-acquisition due diligence of the hotel and subsequent ownership of the property, had actual knowledge that minor children in State custody were being housed at the hotel for residential behavioral and psychiatric treatment. By accepting and continuing to accept financial benefit from that use, Blue Jay Defendants assumed the heightened duty of care that the law attaches to those who knowingly house children on their premises.

265. Blue Jay Defendants assumed a further heightened duty of care by knowingly permitting its property to continue to be used as a de facto residential treatment facility for children with serious psychiatric and behavioral conditions. Blue Jay Defendants, as property owner, had both the authority and the obligation to assess whether this use was safe, to condition its continuation on the implementation of appropriate safeguards, and to terminate the use if those safeguards were not implemented. Its failure to exercise any of these powers, while continuing to collect revenue from the arrangement, constituted an assumption of full responsibility for the foreseeable consequences of that use.

266. Blue Jay Defendants' duties were further elevated by its specific, detailed, actual knowledge of the conditions that made the hotel unsafe at the very moment of acquisition: years of

deferred maintenance and deteriorating physical infrastructure, a financial collapse that had precluded any investment in the property, a security infrastructure that had already failed to prevent a murder, an operational team with a documented record of mismanagement, and a vulnerable child population whose presence in an unmodified hotel room created dangers that required no expert analysis to identify. A buyer whose business targets and acquires distressed properties like the Residence Inn JHMC, and who acquires these properties with actual knowledge of dangerous conditions on site, assumes responsibility for the foreseeable consequences that flow from those conditions.

267. Blue Jay Defendants breached each of these duties by, upon information and belief, failing to:

(a) Commission any safety assessment of the property upon acquisition;

(b) Remediate the physical deficiencies that had accumulated over years of financial neglect and that rendered the hotel unfit to house, for the purpose of supervised medical care, a suicidal minor child with documented psychiatric conditions;

(c) Mandate any policies, protocols, or procedures governing the hotel's care for, or housing of, disabled children or other vulnerable persons placed there by child welfare agencies;

(d) Assess whether the hotel's existing arrangement with Fenwick, pursuant to which foster children with serious psychiatric conditions were placed in unmodified hotel rooms was consistent with applicable law, sound safety practice, or Blue Jay Defendants' duties as property owner;

(e) Impose any conditions on the continuation of the Fenwick placement arrangement, including requirements for licensed clinical staffing, minimum

supervision ratios, secured medication storage, or any other basic safety standard applicable to the residential placement of children with serious psychiatric conditions;

(f) Ensure the hotel's property-level employees were fully trained in accordance with the training requirements of Marriott or Dimension, including all child safety and welfare training requirements;

(g) Communicate with Fenwick, PGDSS, or any other party to the child placement arrangement regarding the change in ownership and its implications for the continuation of those placements;

(h) Make any material investment or improvements to the hotel's physical infrastructure, security systems, staffing, or operational capacity in the weeks between acquisition and Kanaiyah's death;

(i) Require hotel rooms housing foster care children be retrofitted to minimize the risk of self-harm, including by ensuring each such room had secure medication lockers; and

(j) Require life-saving medical equipment to be stored on property and within close proximity to rooms housing vulnerable children.

268. Blue Jay Defendants' failures constituted a systemic, total, and sustained abdication of the duties it assumed when it acquired the hotel at a fire sale price pursuant to a foreclosure sale investors have challenged as rigged. The breaches enumerated above, which bear a direct causal nexus to Kanaiyah's death, were each independently a direct and proximate cause of the unsafe conditions under which Kanaiyah was housed and that led to her death.

269. As a direct and proximate result of Blue Jay Defendants' breaches of duties of care, the conditions that made the Residence Inn JHMC an unsafe and dangerous environment for

Kanaiyah were permitted to exist and persist at the time of her placement and at the time of her death. As a further direct and proximate result of Blue Jay Defendants' negligence, Plaintiff has suffered the damages set forth herein.

**COUNT X: NEGLIGENCE BY LSH (IN THE ALTERNATIVE)**

(Against Defendant LSH GE Gateway 2, LLC)

270. Plaintiff incorporates and realleges Paragraphs 1–257 as if set forth fully herein. This Count is pled in the alternative.

271. If the foreclosure sale is reversed or otherwise found ineffective, LSH owned, controlled, and held ultimate authority over the real property and improvements comprising the Residence Inn JHMC at 800 North Wolfe Street, Baltimore, Maryland at the time of Kanaiyah's placement and at the time of her death on September 22, 2025.

272. LSH had full, actual knowledge of the hotel's deteriorated physical condition. It presided, over an extended period, over the accumulation of every deficiency that rendered the hotel unsafe at the time of Kanaiyah's placement: its years of financial collapse and operational neglect, its unresolved security deficiencies, the murder of Kierra Tripp on its premises less than nine months earlier, and its ongoing and recurring use as a residential placement facility for vulnerable minor children in State custody.

273. As a result of the action to set aside the foreclosure sale (which was filed before Kanaiyah died), LSH knew or had reason to know that the June 25, 2025 foreclosure sale was void, voidable, or otherwise engineered in a manner that did not extinguish its ownership interest in the Residence Inn JHMC.

274. Despite that knowledge, LSH took no steps to assert its ownership, notify the state child welfare agencies placing children at the property of the disputed ownership, halt or condition the continued placement of vulnerable children at the hotel, or take any action to address the

dangerous conditions that had accumulated under its stewardship.

275. If adjudged to be the owner of the hotel, LSH owed Kanaiyah four independent and reinforcing duties of care, each elevated beyond that of ordinary negligence by the specific circumstances of the hotel and the population it housed. These duties have been described above and in Count IX in Paragraphs 262–266.

276. LSH breached each of these duties as described in Count IX in Paragraph 267. LSH further breached these duties after it took no additional steps to manage or control the property after it learned in August 2025 that the June 25, 2025 foreclosure sale was void or voidable. In other words, LSH abdicated all responsibilities to the vulnerable children housed in the hotel after the foreclosure based on its belief it no longer owned the property when, in fact, it may still be the rightful owner.

277. LSH's failures constituted a systemic, total, and sustained abdication of the duties it assumed as the developer and owner of a hotel it knew was being used to house and treat the most vulnerable category of guests imaginable. The breaches enumerated above, which bear a direct causal nexus to Kanaiyah's death, were each independently a direct and proximate cause of the unsafe conditions under which Kanaiyah was housed and that led to her death.

278. As a direct and proximate result of LSH's breaches of its duties of care, the conditions that made the Residence Inn JHMC an unsafe and dangerous environment for Kanaiyah were permitted to exist and persist at the time of her placement and at the time of her death. As a further direct and proximate result of LSH's negligence, Plaintiff has suffered the damages set forth herein.

## COUNT XI: NEGLIGENCE BY MARRIOTT—NEGLIGENT EXERCISE OF RETAINED CONTROL OVER SAFETY AND CHILD-PROTECTION TRAINING

(Against Defendant Marriott International, Inc.)

279. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

280. Plaintiff brings this Count against Marriott for its negligent failure to train and supervise the personnel of the Residence Inn JHMC with regard to the protection of children. This Count concerns a discrete operational function over which Marriott retained and exercised (or had the right to exercise) direct control: the content, assignment, delivery, tracking, and enforcement of mandatory safety and child-protection training at Marriott-branded properties, including the Residence Inn JHMC. Unlike the franchisee's control over hotel employees' day-to-day work, Marriott's retained control over this function determined the operative details of what child-safety training those employees received, which employees were required to receive it, when they received it, and whether deficient or incomplete training was corrected.

281. Marriott, upon information and belief, prescribed mandatory training for personnel at franchised properties, including the Residence Inn JHMC; determined the subjects on which those personnel were required to be trained; provided or delivered that training through Marriott-controlled platforms and materials; tracked whether personnel completed required training; and retained authority to require retraining and corrective action, including franchisee termination or fines, when training requirements were not satisfied.

282. For years, Marriott has mandated, designed, and delivered required training to its employees, associates, and the employees of its franchisees, including the staff of the Residence Inn JHMC. That training covers a variety of subjects, among them the protection of children and children's rights. Marriott made one such program—"Human Rights and the Protection of

Children"—mandatory at its managed properties and provided it to all Marriott franchise properties worldwide, including the Residence Inn JHMC. Marriott incorporated its commitment to the protection of children into its business ethics program, "How We Do Business Is As Important As the Business We Do," which Marriott required for use in all new-employee orientation and made available to property-level employees in 23 languages.

283. Upon information and belief, Marriott's mandatory child-protection training continued through 2025. Marriott delivered or made that training available to personnel at the Residence Inn JHMC through its own webinars, online portals, and orientation materials; prescribed the curriculum; determined which personnel were required to complete which modules and how often; tracked completion through Marriott-controlled learning platforms; reviewed training compliance through its property-certification and quality-assurance processes; and retained the right to require retraining and corrective action, and ultimately to terminate the franchisee, if it failed to comply.

284. Upon information and belief, Marriott's franchise agreement and brand standards required personnel at the Residence Inn JHMC to complete Marriott-prescribed training as a condition of the property's continued operation under the Residence Inn by Marriott brand. Through that agreement, Marriott entrusted the day-to-day operation of a Marriott-branded hotel to the franchisee and its management companies while retaining for itself control over what the hotel's personnel were taught, who was required to be taught, and whether and when they were taught it.

285. Marriott's control over training was not a general right to inspect, to make recommendations, or to insist on compliance with outcomes. Rather, Marriott controlled the operative details of the training function itself, and the franchisee and its management companies were not free to perform that function in their own way. That function—equipping Residence Inn

JHMC personnel to recognize, report, escalate, and respond to danger to child guests—is the very thing from which the injury alleged in this Count arose.

286. Having retained and exercised control over that portion of the Residence Inn JHMC's operations, Marriott owed persons foreseeably endangered by the negligent exercise of that control, including Kanaiyah, a duty to exercise its retained control with reasonable care. Marriott's liability under this Count arises from its own negligent exercise of the training and supervision function it retained and controlled, not from vicarious liability for the acts or omissions of the franchisee, hotel management, Fenwick, or their respective employees.

287. Upon information and belief, the personnel subject to Marriott's retained control over training and supervision with regard to the protection of children included all on-property staff at the Residence Inn JHMC, including front-desk, housekeeping, security, maintenance, and management personnel, whom Marriott required to complete its training.

288. Marriott knew or should have known that the training and supervision function it controlled required particular care at the Residence Inn JHMC, and that its training requirements were not being satisfied there. Among other things:

(a) Marriott knew that the property had been conceived, designed, and marketed to serve medically and developmentally vulnerable guests, including children with disabilities and their caretakers, for stays lasting weeks or months.

(b) Upon information and belief, Marriott's centralized reservation and property-management systems showed recurring, extended, government-arranged stays at the property by minors supervised by third-party caretakers, including Kanaiyah's stay beginning on or about August 4, 2025.

(c) The property's ownership replaced a stable, trained workforce with a

revolving door of contract laborers, with contract-labor costs exceeding $360,000 by July 2025. That workforce model made verification of training at hire essential, because a mandatory training requirement protects no one if new and temporary workers never complete it.

(d) The property passed through three management companies in roughly eight months. Pyramid was terminated in December 2024; JHMD Associates LLC managed the property until July 2025; and Dimension assumed management in July 2025, only weeks before Kanaiyah's placement. Each transition brought new supervisors, new staff, and a renewed need to confirm that Marriott's mandatory training had been delivered.

(e) The November 2024 fatal shooting of Kierra Tripp on the premises provided Marriott additional reason to determine whether personnel at the property had completed required safety training and whether supplemental or corrective training was necessary.

(f) Upon information and belief, the completion data in Marriott's learning platforms and the results of Marriott's property-certification and quality-assurance reviews for the Residence Inn JHMC reflected, or on reasonable review would have reflected, incomplete, lapsed, or undocumented training among the property's personnel. The Residence Inn JHMC spent most of the year before Kanaiyah's placement in foreclosure and receivership. Marriott knew of the subsequent foreclosure, the receivership, and the sale, including because the change in ownership required Marriott's consent to the transfer or relicensing of the franchise. An owner in default and a receiver preserving collateral have strong reasons to defer spending that

does not generate revenue, and a buyer that acquires a distressed hotel at a deep discount to extract value from it has no greater incentive to resume that spending. Staff training is precisely the kind of expenditure that lapses, and upon information and belief, did, in fact, lapse under those conditions at the Residence Inn JHMC. Marriott therefore knew or should have known that training at the property would not be maintained without its intervention.

289. Upon information and belief, Marriott failed to exercise reasonable care in the training and supervision function it retained and controlled, including by:

(a) Designing and prescribing child-protection training that, although it purported to teach personnel to recognize and report danger to children, did not instruct personnel at a long-stay property Marriott knew housed vulnerable minors to recognize and report the indicators of child neglect and failed custodial supervision, including a minor left unattended for hours, a caretaker kept on continuous duty for close to two days without relief, visible signs of self-harm and malnourishment, and unsecured medication accessible to a child, or instruct managers how to receive, escalate, and act on such reports, notwithstanding that Maryland law requires every person who has reason to believe that a child has been neglected to notify the local department of social services or law enforcement;

(b) Failing to require the categories of personnel who actually encountered child guests, including housekeeping, front-desk, and security personnel and the contract laborers staffing those positions, to complete the child-protection training Marriott prescribed;

(c) Failing to deliver required training to, or verify its completion by, personnel

hired or assigned to the property after the 2024–2025 management transitions, including contract laborers and Dimension's staff, and failing to act on the missing or lapsed completion data that Marriott's own learning platforms tracked;

(d) Failing to require retraining, supplemental training, or a training-specific corrective-action plan in response to the property's workforce turnover, its three changes in management, its reliance on contract labor, its foreclosure, receivership, and sale, and the November 2024 homicide on the premises; and

(e) Failing to require and deliver basic emergency-response training for personnel regularly on duty at a property serving medically vulnerable guests, including how to summon and direct emergency medical services, where the property's automated external defibrillator was located and how to retrieve it, and how to initiate or assist CPR, including under a 911 dispatcher's instruction.

290. As a result of Marriott's negligent exercise of its retained control, the personnel at the Residence Inn JHMC lacked the knowledge and competence to perform the child-protective functions over which Marriott retained control. During Kanaiyah's approximately seven-week residence at the Residence Inn JHMC, hotel personnel regularly encountered a visibly underweight 16-year-old girl with more than fifty self-inflicted scars who was living alone, long-term, in a guest room—that Marriott would not ordinarily have permitted a 16-year-old to rent—under the supervision of a rotating cast of untrained caretakers.

291. Upon information and belief, hotel personnel also observed that the same Fenwick caretaker remained on continuous duty from on or about September 20, 2025, through the morning

of September 22, 2025, without relief. No hotel employee reported those conditions to hotel management, PGDSS, law enforcement, or Marriott.

292. Upon information and belief, housekeeping personnel, who entered guest rooms under the right Marriott reserved to enter Kanaiyah's room for safety, security, and maintenance, had occasion to observe unsecured medication, including a 365-count bottle of diphenhydramine, in the room in which a minor child was housed long-term, and did not report it.

293. When the Fenwick caretaker returned to Kanaiyah's room after 10:00 a.m. on September 22, 2025, and found her unresponsive, the caretaker told the 911 dispatcher that she did not know how to perform CPR and could not locate the defibrillator. Upon information and belief, no hotel employee brought the defibrillator to the room, initiated or assisted CPR, or otherwise provided emergency assistance before emergency medical personnel arrived.

294. Marriott's negligent exercise of its retained control over training and supervision with regard to the protection of children was a direct and proximate cause of Kanaiyah's death. Had Marriott exercised that control with reasonable care, hotel personnel would have recognized that a medically and psychiatrically disabled child was living without adequate supervision and would have reported those conditions under Maryland law and through the escalation procedures Marriott's training was intended to supply. A report made at any point in the days preceding September 22, 2025—and particularly once the caretaker's unrelieved shift had extended into a second day—would have prompted PGDSS, Fenwick, or law enforcement to secure replacement supervision and to remove or secure the medication before Kanaiyah's fatal ingestion.

295. Separately, Marriott's failure to require and deliver emergency-response training left hotel personnel unable to respond effectively once Kanaiyah was found. Had they been trained, they would have retrieved the defibrillator, initiated or assisted CPR, and directed emergency responders to Kanaiyah without delay. The resulting delay in, or absence of, CPR and defibrillator

intervention deprived Kanaiyah of timely resuscitative intervention and a meaningful opportunity for potentially life-saving emergency treatment and contributed to her death.

296. As a direct and proximate result of Marriott's negligent exercise of its retained control over training and supervision of Residence Inn JHMC personnel with regard to the protection and safety of children, Plaintiff has suffered the damages set forth herein, including Kanaiyah's conscious pain and suffering before death, the loss of her life, and all economic and non-economic losses sustained by her Estate and her surviving parent.

## COUNT XII: NEGLIGENCE BY MARRIOTT—NEGLIGENT UNDERTAKING

(Against Defendant Marriott International, Inc.)

297. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

298. Plaintiff brings this Count against Marriott for its negligent performance of child-protection and safety compliance functions that Marriott voluntarily undertook across its branded hotel system, including at the Residence Inn JHMC. This Count concerns Marriott's undertaking to establish organization-wide child-protection standards, to monitor, inspect, and audit its properties for compliance with those standards; to operate mechanisms for detecting, reporting, and escalating danger to children on its premises; and to require correction of the deficiencies those mechanisms revealed; and to retain control over the training and supervision of franchise personnel with regard to the protection and safety of children, as described in Count XI. Marriott's liability under this Count does not depend on Marriott's employment of hotel personnel or on its control over their work.

299. Marriott has, for years, publicly and repeatedly represented that protecting children and vulnerable guests from exploitation and harm is a core value embedded throughout its global hotel operations.

300. Marriott has also represented that it maintains human-rights and child-protection policies applicable across its portfolio, including a Human Rights Policy that "condemns all forms of exploitation of children"; that it surveys officers and senior managers regarding indications of the mistreatment or exploitation of minors; that it conducts property-level certification audits and quality-assurance inspections to ensure that its hotels meet specified requirements; that it maintains a 24-hour crisis hotline available to managed and franchised properties for urgent incidents; that it expects franchisees to adhere to its Responsible Business Principles and "may take steps to assess adherence"; and that it retains the right and ability to conduct, and does in fact conduct, "welfare checks" of guests, including minor guests as needed.

301. Upon information and belief, Marriott disseminated these representations broadly, including to government agencies and social service providers, such as PGDSS, that place vulnerable individuals in hotel accommodations.

302. By adopting, publicizing, and assuming responsibility for these functions, Marriott undertook a duty to protect children, such as Kanaiyah, placed at Marriott-branded hotels. That undertaking included:

(a) Establishing franchise-wide child-protection standards applicable to franchised properties, including the Residence Inn JHMC;

(b) Monitoring franchised properties for compliance with those standards;

(c) Conducting quality-assurance inspections and compliance audits, including through Marriott's contractual rights to conduct periodic on-site inspections of the property and to audit the franchisee's books and records;

(d) Maintaining reporting and escalation mechanisms, including Marriott's crisis hotline, through which indications of danger to children on Marriott-branded premises would be identified, communicated, and addressed;

(e) Surveying management-level personnel regarding indications of the mistreatment or exploitation of minors;

(f) Requiring corrective action when child-safety deficiencies were detected, including by ordering welfare checks of guests at property-level locations;

(g) Retaining control over the training and supervision of franchise personnel with regard to the protection and safety of children, as described in Count XI; and

(h) Communicating to government agencies and others that these protections operated throughout the Marriott system, including at franchised properties.

303. Marriott recognized that the implementation of child-protection standards, procedures, and training is necessary for the protection of third persons, including children such as Kanaiyah who were housed at Marriott-branded properties for extended periods. By choosing to exercise control over those functions, Marriott assumed a duty of care that it owed to Kanaiyah and that it was required to discharge with reasonable care.

304. Marriott's duty arose independently on two grounds. First, on information and belief, PGDSS reasonably relied on Marriott's representations that these functions operated at its branded hotels, including the Residence Inn JHMC, when selecting that property for, and continuing, Kanaiyah's placement there. That reliance resulted in Kanaiyah's continued exposure to the unsafe conditions alleged herein. Second, upon information and belief, the Residence Inn JHMC's owners, its receiver, and its successive management companies relied on Marriott's compliance, inspection, and escalation functions in lieu of establishing their own protocols for the extended stays of minors in state custody at the property. In performing those functions, Marriott undertook part of the duty that the hotel's owner and operator owed their guests to protect them from foreseeable harm.

305. It was foreseeable that a failure to exercise reasonable care in performing these functions would leave children such as Kanaiyah, who were physically present at Marriott-branded properties in reliance on those very functions, exposed to exactly the harms those functions are meant to prevent.

306. Upon information and belief, the Residence Inn JHMC was subject to Marriott's control over these functions throughout Kanaiyah's placement.

307. The conditions Marriott's compliance system existed to detect were present and discoverable at the Residence Inn JHMC. Upon information and belief, Marriott's reservation and property-management systems reflected recurring, extended, government-arranged stays at the property by minors supervised by third-party caretakers, including Kanaiyah's stay beginning on or about August 4, 2025. Marriott knew, through the same franchise relationship, that the property had spent most of the preceding year in foreclosure and receivership, had passed through three management companies in roughly eight months, depended heavily on contract labor, and had been sold at a foreclosure auction weeks before Kanaiyah arrived. During her approximately seven-week stay, a visibly underweight 16-year-old girl with more than fifty self-inflicted scars lived long-term in a guest room under the supervision of a single third-party caretaker who remained on continuous duty from on or about September 20, 2025, through the morning of September 22, 2025, without relief.

308. Upon information and belief, Marriott failed to exercise reasonable care in performing the functions it had undertaken at the Residence Inn JHMC, including by:

(a) Failing to operate at the property the processes it had undertaken for identifying, reporting, and escalating indications of child neglect and failed custodial supervision, including its surveys of management-level personnel and its crisis-reporting channels (e.g., welfare checks), leaving those

detection and reporting functions ineffective at the Residence Inn JHMC;

(b) Failing to monitor, audit, or verify compliance with its child-protection standards at the property through the compliance-monitoring functions it had undertaken, including its contractual rights to audit the franchisee's books and records and to conduct periodic on-site quality-assurance inspections, notwithstanding its actual or constructive knowledge, through those very mechanisms, of the hotel's deteriorating financial and operational condition, its foreclosure and receivership, and the successive changes in its ownership and management;

(c) Failing to subject the property to heightened compliance review once Marriott's own systems reflected that the property was housing minors in state custody for extended stays under third-party supervision;

(d) Failing to require corrective action, including a property-level protocol for the extended stays of minors in state custody that addressed medication security, welfare checks, and notice to the placement agency when custodial supervision lapsed, and instead, upon information and belief, demanding no property-improvement plan and conducting no reinspection after the June 2025 change in ownership;

(e) Negligently failing to train and supervise franchise personnel with regard to the protection and safety of children, as described in Count XI; and

(f) Continuing to hold the Residence Inn JHMC out to the public, to government placement agencies, and to Kanaiyah as a property operating under Marriott's protective commitments, while failing to exercise reasonable care in performing the functions it had undertaken.

309. Marriott's negligent performance of its undertaking was a direct and proximate cause of Kanaiyah's death. Had Marriott operated with reasonable care the monitoring, inspection, reporting, and escalation mechanisms it undertook, those mechanisms would have detected that a Marriott-branded property in financial collapse and managerial and ownership transition was housing a mentally and physically fragile minor in state custody for an extended stay without property-level safeguards, and that her custodial supervision had broken down. Detection would have triggered escalation to the placement agency and corrective action in time to obtain replacement supervision and to secure the medication before Kanaiyah's fatal ingestion. Instead, the unsafe custodial conditions went undetected and uninterrupted, and the caretaker's extended, unrelieved shift left Kanaiyah without a welfare check for more than four hours on the morning of her death.

310. As a direct and proximate result of Marriott's negligent performance of the functions it undertook, Plaintiff has suffered the damages set forth herein, including Kanaiyah's conscious pain and suffering before death, the loss of her life, and all economic and non-economic losses sustained by her Estate and her surviving parent.

## COUNT XIII: NEGLIGENCE BY MARRIOTT—ACTUAL AGENCY

(Against Defendant Marriott International, Inc.)

311. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

312. An actual agency relationship arises under Maryland law where: (1) the principal consents to another acting on its behalf; (2) the agent acts on behalf of the principal; and (3) the principal retains control or the right to control the agent's conduct.

313. Marriott was not a passive licensor with respect to the Residence Inn JHMC. Upon information and belief, Marriott retains substantial control and authority over its franchisees,

including the Residence Inn JHMC franchisee and its hotel management companies, with respect to matters affecting public health, safety, and guest welfare, including security, emergency preparedness, incident reporting, risk management, compliance with applicable law, staff training, inspections, corrective action, management oversight, and the continued use of Marriott's brand at a property presenting a threat to guest health or safety.

314. Upon information and belief, Marriott reserves the authority to intervene when the condition or operation of a franchised hotel presents a threat to public health or safety. That authority includes the power to establish and modify mandatory standards governing franchised hotels, inspect properties for compliance, require corrective action, and, when Marriott determines that the condition or operation of a hotel presents a public-health or safety threat, direct the franchisee to close the hotel and remedy the condition. Marriott may enforce those requirements through, among other things, termination of the franchise relationship or termination of the hotel management companies. Thus, Marriott possesses the contractual authority to prevent or prohibit uses of its franchised properties that Marriott determines jeopardize the health or safety of guests or members of the public, including the right to allow or disallow its franchises from housing disabled foster care children at its properties, just as it prohibited the Pride Hotel from using property to house migrant and immigrant families.

315. Upon information and belief, Marriott's contractual authority included the right to require property-specific remediation, a property-improvement plan, enhanced inspection, retraining, changes in operating procedures, management intervention, and/or cessation of unsafe practices as conditions of continued use of Marriott's brands, reservations systems, loyalty program, and other proprietary systems. Marriott's retained authority extended to circumstances in which a franchised property accepted or continued to accept a category of guests whose known vulnerabilities made ordinary hotel operations inadequate without additional safety measures.

316. Upon information and belief, Marriott's retained authority extends to the manner in which a franchised property is used when that use implicates public health and safety. Marriott therefore possessed the authority to prohibit or restrict the use of the Residence Inn JHMC to house vulnerable foster children—including disabled foster children—if it determined the conditions under which those children were being housed presented a threat to their health, safety, or welfare; to require its franchisee or its hotel management companies to implement measures necessary to protect those children, including by ordering property-level employees to conduct required "welfare checks"; to train its franchisee's employees on child safety and abuse; and, if necessary, to require the franchisee or its hotel management companies to cease that use of the hotel altogether. Marriott was not contractually powerless to act merely because the Residence Inn JHMC was operated by a franchisee or hotel management company.

317. Upon information and belief, Marriott had the right to control or materially influence the specific safety functions implicated by Kanaiyah's death: whether the Residence Inn JHMC would operate with adequate emergency-response and safety protocols; whether it would maintain and make accessible emergency equipment; whether it would train or require training for on-site personnel responsible for responding to guest emergencies; whether it would report and escalate safety incidents; whether it would institute corrective measures following serious security or safety events; and whether its franchisee and Dimension could continue using Marriott's brand while the hotel accepted long-term placements of vulnerable minors without adequate safeguards.

318. Beyond its retained control rights on matters involving public health and safety, Marriott retains significant control over brand standards, operational protocols, and property-level practices at franchised Residence Inn properties. To preserve the goodwill and brand value associated with the Marriott name and the Residence Inn by Marriott brand, Marriott, upon information and belief, exercises extensive, systemic, and pervasive operational control over the

day-to-day functioning of its franchisees, including the Residence Inn JHMC, through the following mechanisms, among others:

(a) Hosting all online bookings on Marriott's own domains and through Marriott's centralized reservation systems, giving Marriott real-time access to, visibility into, and control over all room reservations at its hotels, including reservations made by government agencies and their agents placing vulnerable persons;

(b) Requiring its franchisees to use Marriott's property management systems, linked to Marriott's corporate networks and data centers, for processing all reservations and credit card transactions;

(c) Gathering reservation, payment, occupancy, and guest browsing data from franchisees through Marriott's centralized systems, thereby giving Marriott comprehensive operational visibility into the hotel's activities, including guest identities, booking parties, stay durations, and occupancy patterns, including the extended placements of foster children;

(d) Requiring franchisees to comply with Marriott's Wi-Fi and internet service requirements, which include limitations imposed by Marriott;

(e) Making or contributing to employment decisions at franchisees, including decisions about hiring, firing, and promotions, and setting employee wages and wage ranges;

(f) Providing standardized training methods, education materials, and orientation programs for all employees at franchisees through Marriott's webinars, seminars, conferences, and online portals, including as described in Counts XI and XII;

(g) Conducting regular inspections of franchisees and their operations for compliance with Marriott's contract terms, rules, regulations, and state and federal laws, with authority to require modifications or terminate the franchise;

(h) Mandating insurance coverage requirements for franchisees;

(i) Providing the software, hardware, and platforms used by franchisees in their daily operations;

(j) Developing and mandating uniform operating policies, procedures, and standards governing franchisees, including policies relating to security and guest safety, child welfare rights, ethics, and risk management processes to identify, prevent, and mitigate risks to guest safety, including as described in Counts XI and XII.

(k) Requiring the franchisee and Dimension to participate in Marriott's safety, risk-management, incident-reporting, quality-assurance, and corrective-action systems, including systems directed at identifying and correcting conditions that jeopardize the health or safety of guests;

(l) Requiring or having the right to require prompt reporting and escalation of serious incidents, security failures, guest injuries, medical emergencies, and circumstances creating a threat to guest safety, including through "welfare checks" and as further described in Counts XI and XII;

(m) Retaining the right to direct property-specific remediation, including changes to operating procedures, training, security, emergency preparedness, staffing of hotel functions, management, and physical safety measures, where Marriott determined that a franchised hotel's operation

threatened guest health or safety; and

(n) Conditioning the continued use of Marriott's proprietary brand, reservation, payment, training, and operational systems upon compliance with Marriott's safety-related requirements.

319. Upon information and belief, Marriott's own Business Conduct Guide states that it applies to "all Company-branded hotels and businesses," and defines its covered persons to include "all of us who act on behalf of Marriott International, Inc. and all of the Marriott brands." By applying this guide to personnel at company-branded franchised hotels, Marriott treated such personnel as persons acting on Marriott's behalf for purposes of its ethical and operational standards.

320. Upon information and belief, Marriott exercised the foregoing control rights at the Residence Inn JHMC. Marriott received property-level financial, operational, reservation, occupancy, and/or compliance information; conducted or caused to be conducted quality-assurance, brand-compliance, or other on-site assessments; received information concerning the property's management changes, financial distress, foreclosure-related ownership transition, and serious security incident; and possessed the ability to require remediation as a condition of continued franchise operation. Marriott's exercise of those rights gave it actual visibility into the operations of and events occurring at the Residence Inn JHMC.

321. Upon information and belief, Marriott approved, reviewed, acquiesced in, and/or retained the right to approve the appointment and continued service of Dimension, which was managing the Residence Inn JHMC. Marriott accordingly retained and exercised authority over the persons and entities responsible for implementing hotel-level policies governing guest safety, emergency response, welfare checks, staff training, security, incident escalation, and compliance with Marriott brand standards.

322. Upon information and belief, Marriott knew or had access to information showing that the Residence Inn JHMC was being used for long-term stays by vulnerable guests, including State-placed children supervised by third-party caretakers. Marriott nevertheless did not exercise its retained authority to require a property-specific safety assessment, a corrective-action plan, a management-level communication protocol, enhanced emergency-response procedures, or a restriction on continuing to accept placements that the property could not safely support.

323. Through this comprehensive framework, Marriott functioned as a principal directing the operations of the Residence Inn JHMC, with the hotel's successive owners, its management companies, and their contractors and sub-contractors serving as agents or sub-agents executing Marriott's system on Marriott's behalf and for Marriott's financial benefit. Marriott's actual control or right to control included the safety and operating functions directly implicated in this action—not simply visual presentation, reservation technology, or other brand-identification matters. The franchisee, Dimension, and their personnel (including contractors and sub-contractors) carried out Marriott-directed systems for guest safety, incident response, training, inspection, reporting, quality assurance, and corrective action. Their acts and omissions in operating the Residence Inn JHMC, including their handling of known long-term placements of vulnerable minors, were undertaken within the scope of those agency relationships.

324. As a result of the actual agency relationships alleged herein, Marriott is vicariously liable for all negligent acts and omissions of Dimension, Blue Jay and Excel Group, and, in the alternative, LSH, as alleged in Counts VIII, IX, and X above, which were committed by those entities in their capacities as Marriott's actual agents and within the scope of their respective agency relationships.

325. As a direct and proximate result of these acts and omissions, Kanaiyah died on September 22, 2025, and Plaintiff has suffered the damages set forth herein.

## COUNT XIV: NEGLIGENCE BY MARRIOTT—APPARENT AGENCY

(Against Defendant Marriott International, Inc.)

326. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

327. An apparent agency relationship arises under Maryland law where: (1) the principal holds out the apparent agent as having authority to act on its behalf; (2) a third party reasonably relies on those representations; and (3) the third party suffers harm as a result of that reliance.

328. As alleged herein, Marriott affirmatively and deliberately held out the Residence Inn JHMC (and the franchise system it operated) as functioning under Marriott's direct authority, supervision, and guarantee of safety, inducing foreseeable and detrimental reliance by those responsible for placing Kanaiyah at the hotel, to their and her fatal detriment. Marriott did not disclose to PGDSS, Brooke Ward, Kanaiyah, or any other relevant person that it disclaimed operational responsibility for the property's guest-safety systems, emergency-response practices, contractor-access arrangements, or the suitability of the property for long-term placement of vulnerable minors. Instead, Marriott presented the Residence Inn JHMC property to the public and institutional placement decisionmakers as a seamless component of Marriott's Residence Inn network.

329. First, upon information and belief, PGDSS relied on Marriott's affirmative presentation of the Residence Inn JHMC as part of a unified Marriott hotel system operating under Marriott standards and authority, including Marriott's placement of its name and marks on the property and its presentation of the property through Marriott's centralized reservation and branded operating systems.

330. Upon information and belief, the PGDSS personnel who approved, arranged, and continued Kanaiyah's placement selected the Residence Inn JHMC in material part because it was

held out as a "Residence Inn by Marriott" located at the Johns Hopkins Medical Campus, with Marriott branding, centralized Marriott reservation access, Marriott-style operating standards, and a presentation designed to communicate that the property operated under Marriott's quality, safety, and guest-protection systems. PGDSS did not receive a disclosure sufficient to inform it that Marriott denied responsibility for the hotel's operational safety or for the safety-related functions Marriott represented as part of its branded system.

331. Second, Marriott's public child-protection commitments and the training functions it described are set out in Counts XI and XII. Upon information and belief, PGDSS was aware of, and relied on, Marriott's public child-protection commitments in evaluating the suitability of the Residence Inn JHMC as a placement for Kanaiyah. Those commitments signaled to PGDSS that a Marriott-branded property was an environment in which the safety of a vulnerable child in state custody would be recognized, prioritized, and protected.

332. Third, upon information and belief, PGDSS relied on Marriott's deliberate co-location and co-branding of the hotel with the Johns Hopkins Medical Campus, one of the most trusted medical institutions in the world. This co-branding was a deliberate commercial and reputational choice by Marriott to associate its brand with the credibility, safety, and institutional integrity of Johns Hopkins. For a state agency responsible for placing a medically and behaviorally vulnerable child, the association of the Residence Inn brand with the Johns Hopkins Medical Campus was a powerful signal of suitability—a signal Marriott had deliberately engineered and commercially exploited (beyond Baltimore and throughout its Residence Inn brand), and one on which PGDSS relied in placing Kanaiyah at the Residence Inn JHMC.

333. Fourth, upon information and belief, PGDSS relied on the hotel's own child-specific and disability-focused infrastructure. The hotel was specifically designed, with input from Johns Hopkins and the Kennedy Krieger Institute, to exceed minimum disability-accommodation

standards in recognition of the fact that a core demographic for the hotel included individuals, including children, with disabilities. The hotel also maintained a dedicated room—Room 711—that served as the "Children's House Lounge," to which vulnerable children had access during their stays. This infrastructure signaled to any reasonable placement agency, including PGDSS, that the Residence Inn JHMC was a property that had specifically considered the needs of child-patients staying at the hotel and had taken affirmative steps to accommodate them.

334. Fifth, upon information and belief, the Residence Inn JHMC and other Marriott-branded properties in Maryland had an established practice of accepting placements of foster children arranged by state and county officials through Fenwick and others. Pursuant to this arrangement, Fenwick and others regularly supervised foster children, including minors with documented behavioral challenges, developmental delays, and/or psychological needs, at the Residence Inn JHMC for extended stays, as a substitute for licensed residential care facilities. To PGDSS, this history of prior placements provided confirmation that Marriott properties were suitable environments for children in state custody with behavioral and mental health needs.

335. Sixth, upon information and belief, PGDSS relied on Marriott's published brand standards and quality assurance program, which Marriott itself had publicly represented as ensuring consistent safety, cleanliness, and quality across all Residence Inn properties. Marriott's own marketing materials describe the Residence Inn brand as designed for extended-stay guests requiring a residential-quality environment, and that marketing specifically emphasized the brand's ability to accommodate a population of medically and behaviorally vulnerable persons.

336. Taken together, these representations by Marriott created a foreseeable basis for PGDSS to conclude that the Residence Inn JHMC was a suitable placement for Kanaiyah under the circumstances. And, upon information and belief, PGDSS did, in fact, rely on those representations, to its detriment and to Kanaiyah's, in concluding that the Residence Inn JHMC

was a suitable placement for Kanaiyah. What PGDSS did not know, however, was that the deteriorating hotel was in serious and accelerating decline and was wholly unsuited to serve its advertised purpose of housing vulnerable and disabled minors.

337. As a direct result of PGDSS and/or the State's detrimental reliance on Marriott's representations—and in the absence of any sufficient disclosure by Marriott of the hotel's actual conditions—PGDSS and the State placed Kanaiyah at the Residence Inn JHMC on or about August 4, 2025. That placement ultimately cost Kanaiyah her life.

338. Under the doctrine of apparent agency, Marriott is vicariously liable for the negligent acts and omissions of Dimension, Blue Jay, and Excel Group, and, in the alternative, LSH, as alleged in Counts VIII, IX, and X above.

**COUNT XV: WRONGFUL DEATH (Md. Code, Cts. & Jud. Proc. §§ 3-901 et seq.)**

(Against All Defendants, and Against LSH in the Alternative)

339. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth fully herein.

340. The Maryland Wrongful Death Act, Md. Code, Cts. & Jud. Proc. §§ 3-901 et seq., entitles the surviving parent of a deceased minor child to maintain a civil action against those whose wrongful act, neglect, or default caused the child's death and to recover all economic and non-economic damages resulting therefrom, including solatium.

341. Kanaiyah Ward, a 16-year-old girl in the legal custody of PGDSS and the State of Maryland, died on September 22, 2025, at the Residence Inn JHMC as a direct and proximate result of the wrongful acts, negligence, and constitutional and statutory violations of each Defendant as alleged in Counts I through XIV above. Her death was not an unforeseeable tragedy; it was the predictable consequence of placing a visibly vulnerable, suicidal minor in an unsafe, unmodified, and wholly unsuitable environment after years of audited, litigated, and documented warnings that

this precise outcome would occur.

342. Plaintiff Brooke Ward is the surviving parent of Kanaiyah and a primary beneficiary entitled to bring a wrongful death action under Md. Code, Cts. & Jud. Proc. § 3-904. She has suffered damages including:

(a) Extreme mental anguish, grief, and emotional suffering arising from the sudden and preventable loss of her daughter at age 16, her only child;

(b) Loss of the society, companionship, comfort, protection, care, attention, guidance, and counsel that Kanaiyah would have provided to her mother throughout their lives together;

(c) Loss of the filial relationship, including the love, affection, and moral support of a child whose life was of immeasurable value;

(d) Loss of Kanaiyah's future economic contributions and services; and

(e) All other economic and non-economic damages cognizable under the Maryland Wrongful Death Act, including solatium damages for the grief and mental anguish caused by the loss of her only child.

343. Defendants' wrongful acts, as alleged throughout this Complaint, were willful, wanton, and committed in conscious disregard of the safety and rights of Kanaiyah—entitling Plaintiff to punitive damages to the extent permitted by applicable law.

344. Defendants are jointly and severally liable to the extent provided by applicable law for the damages recoverable by Plaintiff under this Count and the other applicable Counts of this Complaint.

**COUNT XVI: SURVIVAL ACTION (Md. Code, Cts. & Jud. Proc. § 6-401)**

(Against All Defendants, and Against LSH in the Alternative)

345. Plaintiff incorporates and realleges each of the preceding paragraphs as if set forth

fully herein.

346. The Maryland Survival Act, Md. Code, Cts. & Jud. Proc. § 6-401, permits the personal representative of a decedent's estate to maintain any action for damages that the decedent could have maintained had she survived. Plaintiff Brooke Ward brings this Count in her capacity as the duly appointed Personal Representative of the Estate of Kanaiyah, appointed by the Orphans' Court for Prince George's County, Maryland.

347. Kanaiyah experienced conscious pain and suffering prior to her death on September 22, 2025. Upon information and belief, Kanaiyah ingested a fatal quantity of diphenhydramine during a period of over four hours in which she was left entirely without supervision in her hotel room—more than four times the maximum interval permitted by Fenwick's own policies. A diphenhydramine overdose of the magnitude Kanaiyah ingested produces, among other symptoms, confusion, agitation, dry mouth, flushing, rapid heart rate, urinary retention, visual hallucinations, and, in severe cases, seizure, respiratory depression, and coma—effects consistent with a period of conscious awareness and suffering before the loss of consciousness that preceded her death. She was pronounced dead at 11:01 a.m. on September 22, 2025, having been left alone and without any welfare check since approximately 5:45 a.m.

348. Kanaiyah was 16 years old at the time of her death. She had endured years in the Maryland foster care system, marked by documented psychiatric illness, prior suicide attempts, and sustained self-harm. Her final seven weeks were spent in a hotel room in a property that was, upon information and belief, financially collapsed, physically deteriorated, and operationally stripped to the point of unsafety—a property that bore a brand name that had promised her protection but delivered none.

349. The Estate of Kanaiyah, through Personal Representative Brooke Ward, is entitled to recover all damages that Kanaiyah could have recovered had she survived, including:

(a) Compensatory damages for the conscious pain, suffering, and terror Kanaiyah experienced in the period between her ingestion of a lethal quantity of diphenhydramine and her death;

(b) Compensatory damages for the physical pain, emotional distress, and fear associated with the circumstances of her death—alone, unsupervised, in an environment that every Defendant had a duty to make safe and none did; and

(c) All other damages to which the Estate is entitled under the Maryland Survival Act, Md. Code, Cts. & Jud. Proc. § 6-401.

350. Defendants are jointly and severally liable to the extent provided by applicable law for the damages recoverable by the Estate under this Count and the other applicable Counts of this Complaint.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, and award the following relief:

(a) Compensatory and punitive damages for violations of 42 U.S.C. § 1983;

(b) Compensatory, punitive, special, and exemplary damages for violations of the Maryland Declaration of Rights;

(c) Compensatory, punitive, and special damages for violations of the Fair Housing Act, including damages for pain, suffering, and emotional distress, pursuant to 42 U.S.C. § 3613(c)(1);

(d) Compensatory damages under Maryland's Local Government Tort Claims Act;

(e) Compensatory damages for wrongful death, including loss of solatium, past and future grief, and all other economic and non-economic damages cognizable under the Maryland Wrongful Death Act;

(f) All compensatory, punitive, special, and exemplary damages available under the Maryland Survival Act;

(g) Attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 & 3613(c)(2);

(h) Prejudgment and post-judgment interest; and

(i) Such other and further relief as this Court deems just and proper.

Dated: October 20, 2026

Respectfully submitted,

By: /s/ *Scott E. Lerner*

Scott E. Lerner (Bar No. 13327)
Tara M. Lee (Bar No. 17902)
Vincent H. Cohen Jr. (Bar No. 26301)
Benedict S. Bernstein (*pro hac vice* forthcoming)
Aimee C. Hwang (*pro hac vice* forthcoming)
DECHERT LLP
1900 K Street N.W.
Washington, D.C. 20006
Tel.: +1 202 261 3300
Fax: +1 202 261 3333
Scott.Lerner@dechert.com
Tara.Lee@dechert.com
Vince.Cohen@dechert.com
Benedict.Bernstein@dechert.com
Aimee.Hwang@dechert.com

Thomas E. Doyle (Bar No. 09659)
DOYLE & ASSOCIATES, LLC
101 North Adams Street
Rockville, Maryland 20850
Tel.: +1 301 738 3771
Fax: +1 301 738 3709
tdoyle@doylelawdmv.com

DeMaurice F. Smith (Bar No. 06863)
101 North Adams Street
Rockville, Maryland 20850
Tel.: +1 301 738 3771
Fax: +1 301 738 3709
Smithassistant1701@gmail.com

*Counsel for Plaintiff Brooke Ward, individually and as personal representative of the estate of Kanaiyah Ward, deceased*